Dorothy **CASINO, as Administrator of the Estate of Raymond Casino, Deceased, Plaintiff,**

v.

**MAHOPAC CENTRAL SCHOOL DISTRICT and Joseph Girven, Defendants.**

No. 88 Civ. 4504 (CLB).

United States District Court, S.D. New York.

Dec. 5, 1989.

On Application for Fees and Disbursement Dec. 12, 1989.

On Determination of Back Pay Dec. 26, 1989.

**1030**

Donald Sapir, William Frumkin, White Plains, N.Y., for plaintiff.

David Silverman, Ricki H. Berger, New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

Following a jury verdict described below, defendants, by motion fully submitted for decision on November 29, 1989, moved for an order "setting aside the jury verdict of October 3, 1989 and/or entering a judgment for the defendants notwithstanding the verdict or, in the alternative, for an order setting aside the jury verdict and granting a new trial."

Mr. Raymond Casino, the original plaintiff in this action, died intestate on October 13, 1989. His death occurred after the jury verdict had been taken but prior to the entry of any judgment. His widow, Dorothy Casino, has been appointed Administrator of his estate and substituted as a party plaintiff by an oral order of the Court made November 29, 1989.

This action, by a Bus Driver/Custodian employed by defendant school district and supervised by defendant Girven, was filed June 28, 1988. From time to time the pleadings were supplemented and amended, so that it is somewhat difficult to characterize the numerous claims sued on. However, the case went to the jury on special interrogatories as provided by Rule 49(b) Fed.R.Civ.P. The jury found that the school district discriminated against Mr. Casino with regard to his conditions of employment because of a physical handicap in violation of § 504 of the Rehabilitation Act of 1973 as amended, 29 U.S.C. § 794 ("Rehabilitation Act") but did not discriminate because of age. It found that Mr. Girven did not discriminate against Mr. Ca-sino because of his age or his physical handicap but that Girven did retaliate against plaintiff by making an adverse personnel decision motivated in part by the exercise by plaintiff of his First Amendment rights to protest the promotion of Ms. Lanzo, discussed below. The jury awarded $100,000.00 in damages against the school district, and an additional sum of $5,000.00 in damages against Mr. Girven for the First Amendment Rights violation.

*The Evidence*

██ Viewing the evidence at trial most favorably to the non-moving party, as we must do, the trial jury could have and presumably did find the facts stated below.

Mr. Raymond Casino was employed by the Mahopac Central School District in a position in the Classified Civil Service of the State of New York under a combined job title of "bus driver/custodian." He worked as such on the day shift from the mid 1960's until May 26, 1987, when he was reassigned to a newly created position in the table of organization of the School District as a night custodian, a cleaning position involving no bus driving responsibilities. For a number of years prior to this reassignment, and even at the time of trial, his wife Dorothy Casino was also employed by the School District in the position of bus driver/cleaner. She too was assigned on the day shift. The cleaning work on the night shift was also much more demanding, since heavy cleaning cannot be done during the day while classes are being conducted. The School District had a right under the Union Contract to assign any school bus driver to full time cleaning duties, and also had the right to place any employee on the night shift. Day shift bus drivers might do some cleaning between bus runs and, on a particular day, might do none.

Mr. Casino was also a respected citizen in the community from which the School District Board Members are elected, and was the parent of children attending its schools. In addition to the job security provisions available to a permanent appointee in the New York State Classified Civil Service (*see e.g.* New York Civil Service Law Sec-

tion 75), Mr. Casino also enjoyed cumulative job tenure provisions under a collective bargaining agreement administered by an independent collective bargaining association, hereinafter referred to as "the Union." He could not be fired except for cause after a hearing. Such a decision could be reviewed in state court or arbitrated under the Union contract.

As a bus driver, Mr. Casino was well regarded by the children and their parents. We might fairly say that they loved him. The proof also showed that he had a heavy foot. To control his speeding, he was assigned the only van equipped with a tachograph to make a daily record of vehicle speed. All school buses, but not all vans, had tachographs. Other drivers also engaged in speeding from time to time, and the School District was somewhat desultory in reviewing the tachographs or otherwise enforcing its rules concerning speed.

The proof also showed that shortly prior to the events of which he complains, Mr. Casino wilfully disregarded the directions of the dispatcher as to which vehicle he should operate on a specific run, taking another vehicle which was more to his liking. The vehicle so chosen was on "mechanical hold," which is to say that its operation was not permitted until maintenance personnel had concluded certain inspections and/or repair work. No injury resulted, but this insubordinate conduct resulted in a rancorous exchange between Casino and employees charged with maintenance and supervision of the school busses.

Although the School District had a factual basis upon which to discharge Mr. Casino for speeding infractions and for the unauthorized selection of a vehicle on mechanical hold, the District apparently was daunted by the difficulties and effort required to satisfy the union grievance procedure, including a hearing and arbitration. The District also seems to have been deterred by parallel and comparable job security provisions available to Mr. Casino under the New York Civil Service Law.

In an unrelated but contemporaneous episode, Mr. Casino exercised his First Amendment Rights by "speaking out" against a personnel decision by which Ms. Lanzo, another bus driver/cleaner, was assigned to perform administrative and secretarial duties in the bus garage during such time as she was not driving. Ms. Lanzo thereby became exempt from the existing practice in the School District, which was for all bus drivers to do either cleaning or custodian work (indistinguishable except for pay differentials) when they were not actually driving a bus. Mr. Casino's expressions concerning Ms. Lanzo were intemperate, objectively unjustified and highly provocative. He was, however, clearly entitled to speak his mind on a matter involving local governmental administration free from retaliation.

The relationships between the parties were further affected by the fact that Mr. Casino was eligible to retire and in extremely poor health. He had major extended absences from duty due to health. A serious heart condition, treated by triple by-pass surgery, limited his ability to perform heavy labor, and numerous other ailments had a synergistic effect with his heart disease. He exhausted his own sick leave and sick leave donated by others, and his absences from work became ever-increasing.

Defendants first attempted to induce or assist Mr. Casino in retiring. These efforts were pleaded as a basis for an age discrimination claim and ultimately rejected by our trial jury. Defendants also attempted to discipline him for various instances of misconduct and insubordination. The jury was entitled to find, however, that defendants were not so rigid in the discipline of others similarly situated, especially in regard to speeding, and that management was offended by Mr. Casino's bitter attack on Ms. Lanzo's job assignment.

Recognizing the deteriorating state of his relationships with his employer, Mr. Casino offered to retire if the School District would pay him $5,000.00 in severance pay. We observe in passing that this litigation has already cost a great deal more than that, but no counter-offer to such severance pay demand was made. De-

spairing of ousting Casino based on his disciplinary infractions, the School District embarked upon an alternative plan. This plan called for the creation of a new custodian job assignment on the night shift and transfer of Mr. Casino to this much more difficult and arduous position, which entailed no bus driving.

Our jury concluded on the totality of the evidence presented to it that Mr. Girven's participation in recommending this significant personnel change for Mr. Casino was motivated at least in part by a desire to retaliate against Casino for his strident protests concerning Ms. Lanzo. While this Court might conclude that Girven's participation in the personnel decision was not tainted by a desire to retaliate for First Amendment exercise, we must concede that the jury acting within its province could have so found, as our jury did in fact do. There is, however, no evidence that Girven's supposed evil motivation were known to Dr. Cicchelli, the Superintendent of Schools, and the policy-making officer who recommended to the School Board creation of a night custodian job especially for Mr. Casino, or that it was known to the governing School Board itself.

Plaintiff argued to the jury, and the jury could have found, that Mr. Casino's transfer to this newly created night shift position was intended to and did create far heavier physical demands upon him than were required for the day shift assignment as a combination bus driver and custodian, that imposition of these additional burdens would, as intended, ultimately cause him to leave the employment of the School District, and that separation from his wife, who was retained on the day shift, would punish him. All this as a means to avoid the need to conduct the cumbersome disciplinary hearings required before the School District could discharge Mr. Casino for cause in compliance with the New York State Civil Service Law and the Union Contract.

The Court concludes that there is adequate evidence in the trial record, although perhaps barely so, to support the verdict. The case involved assessments of credibility and motive that are classically within the province of the jury, and the jury's conclusions should not be set aside simply because the Court believes that the jurors may well have been wrong.

*Equitable Relief*

Plaintiff originally demanded injunctive relief to effect his reinstatement to his tenured civil service employment as a school bus driver/custodian. At trial, defendant school district recognized, as it must, that Mr. Casino would be entitled to reinstatement as soon as he produced a certificate from a physician stating that he was capable under the law of driving a school bus or serving as a custodian. Based on that acknowledgment, the Court ruled that "after [Mr. Casino] gets this [medical] certificate, the trial record is such here that the defendant must reemploy him as a school bus operator ... accordingly, I'm not taking the testimony of the doctor [on this point]." The Court thereby simplified the issues in the case.

But for the discussion on the record leading to this concession, the Court would have submitted, as an additional interrogatory to the jury, the fact issue of whether Mr. Casino was then and there physically fit to perform the work of his tenured civil service position. Had the jury answered in the affirmative (in effect, that it believed the doctor and that there was no credible contrary evidence) the Court in reliance on that fact finding would have entered an injunctive order requiring plaintiff's immediate reemployment.

It now appears that, immediately after the conclusion of the trial, a medical certificate was in fact produced as contemplated by the discussion at trial which led to the Court's ruling withdrawing this factual issue from the jury. However, the School District apparently delayed restoring Mr. Casino to employment pending further examination by another physician of its own choice. Plaintiff now requests an injunctive order from this Court giving effect to the Court's ruling.

It is quite obvious that this Court cannot currently enjoin the District to employ a deceased person, either in the future or

*nunc pro tunc.* In view of the fact that injunctions operate prospectively, not as punishment for the past misconduct, the Court must decline plaintiff's request for an injunctive order. *See* N.Y.Jur.2d, Injunctions § 3 (injunctions are not the appropriate remedy for past injuries nor for restoring parties to rights of which they have already been deprived).

The Court does, however, conclude that the plaintiff is entitled to a declaratory judgment to the effect that, upon filing of the medical certificate, and thereafter until the day of his death, Mr. Casino was ready, willing and able to resume his employment, that he was legally entitled to such reemployment, including enjoyment of the status of an employee under the Union contract and New York Civil Service Law, and that he was entitled to unpaid wages from the date of the delivery of the certificate to the date of his death, diminished by any other income which he may have earned from his labors during such brief period. The judgment to be submitted hereunder may reserve jurisdiction for the purpose of adjudication the amount of this compensation if it should be necessary to do so.

*The Jury Instructions*

■ An additional issue apart from the question of the sufficiency of the evidence, or the propriety of the jury's evaluation of the evidence, is also raised by the motion in support of a new trial.

Section 504 of the Rehabilitation Act as codified at 29 U.S.C. § 794 states in relevant part "no otherwise qualified individual with handicaps in the United States … shall, solely by reason of his/her handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." Defendants argue that, in order to recover under the Act, plaintiff should have been required to show, and the jury should have been instructed that it must find, that handicap discrimination was the *sole and exclusive* cause of plaintiff's transfer to night shift custodial duties. Defendants contend that the Court erred in instructing the jury that it should return a verdict in

Mr. Casino's favor if, after considering all of the relevant evidence, the jury found that Mr. Casino's physical disability—specifically, his heart condition, a handicap that both sides in this lawsuit concede to have existed at the time—was a *substantial factor* in Mr. Casino's transfer. Defendants preserved this issue by making timely requests to charge and taking an exception on the record to this Court's refusal to charge "sole and exclusive."

This Court believes that defendants' interpretation of the Rehabilitation Act would, if adopted, rob the Act of much of its remedial force and frustrate Congress' purpose in enacting a statute against handicap discrimination. The Court relies on *Doe v. New York University,* 666 F.2d 761, 776 (2d Cir.1981) in which our Court of Appeals held that where, as here, "the defendant disclaims any reliance on the plaintiff's handicap," the traditional burden-shifting analysis employed in Title VII discrimination cases "may be appropriate for § 504 suits." *Id.* at 776. In the typical Title VII case involving burden-shifting and proof of pretext, distinctions between *sole* versus *substantial* causation do not arise; proof that the reason(s) proffered by the defendant is/are pretextual creates a presumption of a single or sole illegal reason, which, in turn, entitles the plaintiff to a judgment in his favor. If, as our Court of Appeals suggested in *Doe,* this traditional burden-shifting analysis applies to Rehabilitation Act cases in which defendants disclaim any reliance upon physical handicap, it follows that plaintiffs in such cases need only show that the lawful reasons upon which defendants claim reliance were pretextual or, as in this case, evanescent upon examination.

Direct proof of *sole* causation would, as the Supreme Court has repeatedly acknowledged in discussing Title VII cases, present most plaintiffs with an insurmountable burden. Indeed, one of the reasons why the Supreme Court devised a complex and sometimes cumbersome burden-shifting approach is that defendants in Title VII cases often deny reliance upon illegal factors. Because plaintiffs often have no direct evi-

dence of discrimination, the burden-shifting rule is designed to work substantial justice in the absence of such evidence. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

Title VII cases, of course, are not tried before juries, so federal trial judges have little experience in patterning jury instructions after the Supreme Court's burden-shifting analysis. In fact, burden-shifting instructions ordinarily need not even be considered in jury cases involving handicap discrimination, for, as our Court of Appeals noted in *Doe*, the typical age or handicap discrimination case involves a defendant who *admits* to some, albeit lawful, consideration of age or disability. Thus, in the ordinary run of cases, indirect proof of pretext is unnecessary. Plaintiffs may prosecute their claims by directly examining the defendants' deliberations.

The only cases in which district courts must deliver jury instructions that capture the concept of the Supreme Court's burden-shifting approach are those in which a defendant *denies* consideration of age or physical disability. In this narrow category of cases, courts must fashion instructions that reflect, as nearly as possible, the most recent burden-shifting pronouncement in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Expressing such burden-shifting analysis in a manner intelligible to lawyers is, for federal appellate courts, no mean feat. For trial courts to instruct laypersons in such subtleties is more difficult by half.

This Court believes that, once the plaintiff in this litigation demonstrated that the defendants' reasons for transferring him were pretextual, or indeed non-existent, issues of causation dropped out of the case. Even in the absence of direct evidence of discrimination, plaintiff was entitled to judgment in his favor once he succeeded in making out a prima facie case under § 504

of the Rehabilitation Act and further succeeded in showing that the School District's stated reasons for transferring him were pretextual. The Court's instruction that the jury should find for the plaintiff if it believed that handicap discrimination was a "substantial factor" in the School District's decision was directed not to the plaintiff's effort to show pretext. but rather to his effort to prove by *direct evidence* that illegal considerations played a substantial, though perhaps indeterminate, role in Mr. Casino's transfer. The instruction was designed to comport with the Supreme Court's holding in *Hopkins* that direct evidence of substantial discrimination in a challenged employment decision entitled the plaintiff to a make-whole remedy unless the defendant could prove by a preponderance of the evidence that this proven discrimination did not, in fact, harm the plaintiff. However, since plaintiff was entitled to prevail at trial even in the absence of direct evidence, it makes little sense to quibble over whether the discrimination found by the jury was the "sole" or merely the "substantial" cause of plaintiff's transfer. Thus, even though the Court believes that its instruction was entirely consistent with the teaching of *Hopkins* as it applies, in light of *Doe*, to Rehabilitation Act cases, the Court concludes that its instruction could not have materially prejudiced defendant School District: The jury was entitled to find discrimination based on nothing more than their disbelief of the defendants' proffered reasons.

This whole issue relates to human motivation in decision making. Motivation is always a complex issue. Seldom, if ever, does a human being act solely and exclusively out of a single motivation. This School District had a number of bus driver/custodians. Many of them engaged in speeding, some others were undoubtedly loudmouths and insubordinate from time to time. The inference is inescapable on this trial record that if Mr. Casino had been perceived as a respectful and supportive employee with a regular attendance record, giving no trouble on the job, his non-profit employer would have found a niche for him somewhere in the organization where he

could work during the daytime, enjoy the company of his wife at night, and minimize the adverse effect of sustained exertion upon his heart. That this was not done shows that he was at least disliked and perhaps discriminated against.

The discrimination could not have been effective but for Mr. Casino's physical handicap. The New York Court of Appeals, construing its analogous Human Rights Law, N.Y.Exec.L. §§ 290 et seq., has held that, once a prima facie showing of discrimination has been made, the employer must demonstrate that the action taken against the employee was for "[s]ome independently legitimate reason which was neither a pretext for discrimination nor was substantially influenced by impermissible discrimination." *Pace College v. Commission on Human Rights of the City of New York*, 38 N.Y.2d 28, 40, 377 N.Y.S.2d 471, 339 N.E.2d 880 (1975). In fact, the New York Court of Appeals has expressly rejected any simplistic model of human motivation that would require claimants to demonstrate that illegal discrimination was the "sole" reason for an adverse employment decision. *New York City Board of Education v. Battista*, 54 N.Y.2d 379, 384 n., 446 N.Y.S.2d 1, 430 N.E.2d 877 (1981). This Court shares that view as to the federal statute *in pari materia*.

The other points raised in defendants' motion papers have been considered and do not appear to require comment. The motions are in all respects denied.

This Court has under consideration, and will decide separately, plaintiff's application for attorneys fees. Following resolution of that issue, a single final judgment shall be entered. Counsel, if so advised, may settle such a judgment on notice leaving a blank line for the insertion of the amount of such legal fees and disbursements as this Court shall ultimately determine to be appropriate.

So Ordered.

## ON APPLICATION FOR FEES AND DISBURSEMENTS

By application fully submitted to this Court for decision on November 29, 1989, plaintiff as the prevailing party in this employment discrimination case seeks an award of attorneys fees and disbursements. The original application sought a lodestar award of $188,354.00 and disbursements of $13,772.66, together with a so-called "contingency enhancement" in the amount of $61,378.25, to adhere to that portion of the work which was performed after the late Mr. Casino ceased paying the statements rendered for legal services on account. Prior to March 31, 1989, when he ran out of money due to being on sick leave without pay, Casino had paid his lawyers $36,944.73.

Plaintiff also requests an additional award of legal fees in the amount of $8,095.00 for services and expenses incurred since October 26, 1989, in presenting and defending the application for legal fees, and in resisting post verdict motions. This additional fee is uncontested.

This Court agrees that plaintiff's attorney is entitled to a reasonable award of legal fees. Our efforts to adjust the amount of the fee by compromise or negotiation among the participants has proved unavailing. We are equally firm in our conviction that the entire amount demanded could not reasonably be awarded by the Court in light of the entire record of this case.

We commence our discussion with the request for the "contingency enhancement."

This Court has previously observed that "implicit in the entire American tradition of the contingent fee lawyer, is the concept that the advocate would have a stake in the outcome, which interest would induce the lawyer to invest, or gamble, his or her time ... hoping to share in the benefits which the client would enjoy as a result of the attorney's professional skill, quality of work and success in outcome." *In re Union Carbide Corporation Consumer Products Business Securities Litigation*, 724 F.Supp. 160, 165 (S.D.N.Y.1989). This is not a case that the attorney originally accepted on a contingency fee. Mr. Casino

paid $1,500.00 up front as a retainer and was billed by the attorney, with reasonable regularity, on a lodestar basis. When the bill dated March 14, 1989 was presented, covering the time charges from January 3, 1989, in the amount of $30,309.20, inclusive of disbursements, Mr. Casino for the first time notified counsel that due to being unemployed by reason of health, he was unable to pay the entire bill, and he paid $15,000.00 on account.

By that date, this case was or should have been substantially ready for trial. Contingent fees are supposed to assure representation for impecunious plaintiffs with valid claims by giving lawyers a stake in the outcome instead of a promise of payment. By no stretch of the imagination can it be claimed that counsel's expectation of a contingent fee induced the initial representation in this case. Thus, whatever basis there may be for contingency enhancement of legal fees in other settings, enhancement is inappropriate where the client retains and pays the attorney on a quantum meruit or hourly charge basis and then runs out of money. Accordingly, the Court declines to grant a contingency enhancement in this case above the lodestar.

We next address the question of whether the requested lodestar includes excessive and unreasonably duplicative time charges. Defendants point out that they defended the case with a total expenditure of 496.6 hours and time charges amounting for $45,069.88. In fee shifting cases, the amounts paid to defense counsel may have some relevance in determining the reasonableness of plaintiff's fee application. This fact suggests to the Court only that defendants' counsel were underpaid, and is entitled to slight weight.

Defendants claim that extensive depositions were "conducted not on a good faith basis that evidence would be uncovered, but rather as an exercise of mutual futility or a fishing expedition." This may be true, but it is difficult when testing by hindsight, as we are, to assess the futility of certain aspects of pre-trial discovery.

An attorney starting out in a strongly contested legal matter that has an emotional overlay, having only the information provided by his lay client, which is often incomplete or biased, must of necessity take some pre-trial depositions. An unfortunate custom and practice has arisen of taking too many depositions. This practice is reinforced by the fact that taking depositions is profitable for all lawyers participating. Thus, a bad practice over time has tended to become the norm. In short, while we are sure that there were too many depositions, we are reluctant to make a specific reduction in the legal fees in this case based on testing this important item by hindsight, especially in light of what other privately retained and paid attorneys are doing.

The contention of unnecessary duplication and waste of time stands on firmer ground in connection with the time spent reviewing personnel files and working with the tachographs, and charges for "conferences" between two attorneys in the same office, as well as client telephone calls after the point in time when the client should have been fully debriefed. The amount of time spent consulting with medical experts was also excessive in light of the obviousness of plaintiff's disability. Limited medical consultation may well have been necessary, but counsel devoted substantially more time to such efforts than could reasonably have been expected to advance the case. Likewise, highly competent attorneys commanding hourly rates at the levels claimed here should not have needed to retain an economist in order to construct a plausible theory of damages. The damages at issue in this case were neither extraordinary nor difficult to calculate.

■ Unnecessary amendments to the pleadings also should not be an item of compensation. Plaintiff's attorney was in a position to conduct a full interview of a knowledgeable and articulate client prior to filing the first complaint. One complaint should have been sufficient, and counsel should not be permitted to shift to the defendants charges for the preparation of amended pleadings.

■ A greater difficulty is presented by the question of reimbursement for claims

not proven at trial. We are informed that such an allocation ordinarily should be made. However, where, as here, there is a common core of facts and the legal theories are related, a reduction in the lodestar for unsuccessful claims is not required. *See City of Riverside v. Rivera*, 477 U.S. 561, 569, 106 S.Ct. 2686, 2691, 91 L.Ed.2d 466 (1986), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). The Court finds no basis upon which to distinguish between hours expended on behalf of failed claims in this litigation and those relating to successful claims, and we believe that in the totality of the circumstances, it is probably not necessary to do so here. This case presented a single nucleus of largely undisputed facts which had to be presented to a jury. The nature and extent of Mr. Casino's handicaps were well documented and easily proved. The personnel transfer was not in dispute, and the motivation for doing it was readily inferable from known facts.

Much of the time spent in evaluating or analyzing personnel files and tachographs seems to have been unnecessarily wasteful. The evidence available to the plaintiff at the outset of this inquiry showed that the School District was rather sloppy in the maintenance and follow-up of its files of daily tachographs. Tachographs were sometimes left on the floor of vehicles at the end of the day and not turned in to supervisors; many were missing, and others did not clearly show who was actually driving the vehicle at the moment that the entry was made. Some of the tachographs showed at least short bursts of speeding, although it was not always clear whether students were in the bus at the time of the speeding, or whether the speeding was justified, in order, for example, to pass a parked vehicle or unduly slow construction equipment in the quickest, and therefore in the safest, fashion. Since it has not placed speed governors on its equipment, the School Board must recognize that there are occasions when, consistent with proper management of his or her vehicle, a driver may accelerate beyond the posted speed limit for brief periods. Mr. Casino was obviously familiar with the identities of the chronic speeders, and it seems to the Court to have been an unnecessary waste of time to inspect all of the numerous personnel files covering an extensive period of time, including files of persons no longer employed by the District and persons as to whom there was no reason to suspect improper conduct.

Accordingly, the Court has examined the hours charged by plaintiff's counsel and has deleted the following items from the lodestar:

| Date | DLS | SRS | WDF | MB | JP |
|------|-----|-----|-----|----|----|
| 1/29/88 | .20 | | | | |
| 8/24/88 | 2.10 | | | | |
| 8/24/88 | | .20 | | | |
| 9/29/88 | | | .50 | | |
| 10/03/88 | | | .10 | | |
| 10/06/88 | .20 | | | | |
| 10/13/88 | .30 | | | | |
| 11/04/88 | | | .25 | | |
| 11/14/88 | | .50 | | | |
| 11/15/88 | | | .20 | | |
| 11/16/88 | | | .20 | | |
| 12/08/88 | | | .50 | | |
| 12/14/88 | | | 2.00 | | |
| 12/16/88 | | | 1.00 | | |
| 12/22/88 | | | .70 | | |
| 1/04/89 | | | 2.10 | | |
| 1/05/89 | | | .20 | | |
| 1/05/89 | .30 | | | | |
| 1/09/89 | | | 1.00 | | |
| 2/01/89 | | | .50 | | |
| 2/02/89 | | | 1.00 | | |

1038

| Date | DLS | SRS | WDF | MB | JP |
|---|---|---|---|---|---|
| 2/07/89 | | | .50 | | |
| 2/08/89 | | | 7.10 | | |
| 2/22/89 | 3.0 | | | | |
| 3/01/89 | | | 3.00 | | |
| 3/02/89 | | | 2.00 | | |
| 3/03/89 | | | 2.00 | | |
| 3/06/89 | .20 | | | | |
| 3/06/89 | | | 3.00 | | |
| 3/06/89 | | | | 3.50 | |
| 3/07/89 | | | 4.00 | | |
| 3/08/89 | | | 4.50 | | |
| 3/08/89 | | | | 4.50 | |
| 3/10/89 | | | 7.90 | | |
| 3/13/89 | | | 8.30 | | |
| 3/13/89 | | | | 8.30 | |
| 3/14/89 | | | | .80 | |
| 3/14/89 | | | 2.00 | | |
| 3/15/89 | | | 1.00 | | |
| 3/17/89 | | | 4.00 | | |
| 3/21/89 | | | 5.60 | | |
| 3/22/89 | | | .30 | | |
| 3/30/89 | | | 3.00 | | |
| 4/03/89 | | | 2.00 | | |
| 4/04/89 | | | 6.10 | | |
| 4/06/89 | 1.50 | | | | |
| 4/07/89 | .20 | | | | |
| 4/07/89 | | | .20 | | |
| 4/10/89 | | | 2.90 | | |
| 4/11/89 | | | | | .70 |
| 4/19/89 | | | 1.00 | | |
| 4/21/89 | | | 5.00 | | |
| 4/26/89 | | | 3.90 | | |
| 4/27/89 | 1.20 | | | | |
| 4/27/89 | | | 4.40 | | |
| 4/28/89 | | | 3.00 | | |
| 4/29/89 | | | 5.50 | | |
| 4/30/89 | | | 3.50 | | |
| 5/01/89 | | | 11.90 | | |
| 5/01/89 | | | | 2.50 | |
| 5/09/89 | | | 1.00 | | |
| 5/26/89 | | | .50 | | |
| 6/13/89 | | | 1.00 | | |
| 6/16/89 | | | 2.00 | | |
| 6/23/89 | .20 | | | | |
| 6/23/89 | | | 1.00 | | |
| 6/26/89 | | | 2.00 | | |
| 6/28/89 | | | .80 | | |
| 6/30/89 | .30 | | | | |
| 6/30/89 | | | .50 | | |
| 7/10/89 | | | 1.00 | | |
| 7/10/89 | | | | | .60 |
| 7/26/89 | | | .20 | | |
| 9/05/89 | | | 1.00 | | |
| 9/07/89 | | | 1.00 | | |
| 9/13/89 | | | 1.00 | | |
| 9/21/89 | | | 1.00 | | |
| 9/25/89 | | | 2.00 | | |
| TOTALS: | 9.70 | 0.70 | 133.85 | 19.60 | 1.30 |

'88 — 2.80 × $175.00  .70 × $135  5.45 × $125

'89 — 3.90 × $190.00  131.40 × $135  19.60 × $50  1.30 × $50

| Date | DLS | SRS | WDF | MB | JP |
|------|-----|-----|-----|-----|-----|
| DISALLOW: | $1231.00 | $94.50 | $18,420.25 | $980.00 | $65.00 |

These itemized disallowances total $20,790.75. In addition, analysis of the time charges indicates that an amount of time devoted to preparation for trial, drafting impeachment sheets for witnesses, researching jury charges and trivial points which are, or should be, known to experienced trial lawyers commanding the lodestar rates which these attorneys claim, was excessive. This excessiveness cannot be measured by deleting the entry for a particular day, but the Court concludes that at least 100 hours of lawyer time were devoted to excessive, unnecessary and repetitious pre-trial preparation. While the case was well tried, the hours logged appear to have gone well beyond the amount of time that could have been expected to produce a reasonable return. At an average billing rate of $135 per hour, duplicative or unnecessary efforts account for an additional $13,500 in lodestar reduction.

■ In connection with disbursements, the Court declines to award any money for time which the plaintiff or his wife expended in assisting counsel. We certainly would expect any plaintiff to be of some assistance to counsel in running down facts, sorting documents and the like. The claim for secretarial overtime in the amount of $117.13 is also rejected. The plaintiff had ample notice for trial. Three weeks elapsed between jury selection and the commencement of testimony, and if the case was not ready on the day of jury selection, it should have been. Expert fees paid to counsel's economist, Dr. A. Leiken, are disallowed for the reasons stated above. These fees amount to $1,125.00.

The judgment to be filed in the case will award to plaintiff the sum of $162,158.25 as legal fees, together with $12,530.53 as disbursements. Assuming that the School District will indemnify Mr. Girven, the Court has not attempted to make an allocation as between the defendants.

To the extent that any disbursements due to the School District or its attorneys were incurred but not actually paid, such amounts must be paid out of the judgment. *See* Affidavit of David W. Silverman (November 20, 1989).

The foregoing constitutes the Court's findings of fact and conclusions of law with regard to the attorney's fees and disbursements.

A final judgment has been signed.

## ON DETERMINATION OF BACK PAY

■ The history of this litigation is set forth in this Court's December 5, 1989 memorandum and order. At that time, the Court held *inter alia* that "the plaintiff is entitled to a declaratory judgment to the effect that, upon filing of the medical certificate, and thereafter until the day of his death, Mr. Casino was ready, willing and able to resume his employment, including enjoyment of the status of an employee under the Union contract and New York Civil Service Law, and that he was entitled to unpaid wages from the date of the delivery of the certificate to the date of his death, diminished by any other income which he may have earned from his labors during such brief period." *See* Memorandum and Order of December 5, 1989 (at 1033). On December 12, 1989, the Court filed a second memorandum and decision awarding to plaintiff his legal fees and disbursements. *See* Memorandum and Order of December 12, 1989 (at 1039).

Thus, as of December 12, 1989, only one issue remained outstanding—namely, determination of the amount of back pay owed to Mr. Casino's estate in the event that the parties could not agree on its computation. As the Court previously had noted, "[t]he judgment to be submitted hereunder may reserve jurisdiction for the purpose of adjudication [of] the amount of this compensation if it should be necessary to do so." *See* Memorandum and Order of December 5, 1989 (at 1033). With this ex-

ception, then, the Court's adjudication of this lawsuit was complete, and ready for appellate consideration.

Now, by the annexed letter dated December 11, 1989, defendants claim that the Court has made "no factual finding with respect to the validity of the certificate" and that "the certificate which was given was not in accordance with the requirements of the Civil Service, as well as those of the Department of Motor Vehicles." *See* Letter of December 11, 1989 from David W. Silverman, Esq. Defendants challenge not the *amount* of back pay owed to Mr. Casino but *whether* back pay is owed at all. Viewed either as a request for clarification or as a motion for reconsideration, the import of the letter is the same: Defendants wish to relitigate the merits of the Court's declaratory judgment.

In its earlier decision dated December 5, 1989, this Court noted that "[a]t trial, defendant school district recognized, as it must, that Mr. Casino would be entitled to reinstatement as soon as he produced a certificate from a physician stating that he was capable under the law of driving a school bus or serving as a custodian. *See* Memorandum and Order of December 5, 1989 (at 1032). The rationale behind the decision could not have been more clear: "But for the discussion on the record leading to this concession, the Court would have submitted, as an additional interrogatory to the jury, the fact issue of whether Mr. Casino was then and there physically fit to perform the work of his tenured civil service position." *Id.* Counsel for the defendants invited the Court to take this position when he stated: "[I]f [Mr. Casino] produces a certificate from a physician, or whatever the requirements are, from a M.D. or whatever it may be, that he is capable under the law of driving a school bus, then he is entitled to reinstatement to that position." *See* Trial Transcript of September 26, 1989 at 5. And again: "If a doctor comes in and swears under oath that in accordance with the job description this man is capable of coming back to work, let's assume that's his testimony, and says take him back to work; he goes back to work, we'll order a transcript of his testi-

mony as the certificate." *Id.* These were hardly equivocal litigation positions, for counsel intended to, and did, induce the Court's reliance by making such statements. Thereby there was removed from consideration by the jury the emotional issue of plaintiff's right to work in the future, which might well have colored the jury's view of the past events which were before it for decision.

Defendants would have this Court conduct a *de novo* review of Mr. Casino's physical qualifications for employment even though defendants expressly agreed to be bound by the medical determination of plaintiff's expert witness and even though Mr. Casino is now deceased. The Court believes, however, that defendants cannot disclaim such earlier concessions merely because they may prove costly or inconvenient. The annexed letter dated December 11, 1989 from Mr. Silverman is therefore treated as a motion for a further evidentiary hearing and, as such, denied.

If the parties cannot agree on the amount of back pay owed to Mr. Casino between the date of the Medical Certificate and the date of his death, they may request a hearing to resolve that issue.

SO ORDERED.