276 N.J. Super. 398 (1994)
648 A.2d 223
CANDY RENDINE AND BERNADETTE LORESTANI, PLAINTIFFS/RESPONDENTS-CROSS-APPELLANTS,
v.
EDWARD PANTZER, D/B/A PANTZER MANAGEMENT COMPANY, DEFENDANT/APPELLANT-CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 16, 1994.
Decided July 14, 1994.
*406 Before Judges KING, HAVEY and RODRIGUEZ.
Rosemary Alito argued the cause for appellant/cross-respondent (Carpenter, Bennett & Morrissey, attorneys; Stephen F. Payerle and Patricia Bellac, on the brief).
Nancy Erika Smith argued the cause for respondents/cross-appellants (Smith, Mullin & Kiernan, attorneys; Ms. Smith, Kyle M. Francis, Jon W. Green and Tara Levy, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
In this sex discrimination case, the employer, defendant Edward Pantzer, owner and president of Pantzer Management Company, a rental property management business with about 190 employees, appeals from a jury's verdicts and substantial damage awards in favor of two former employees for violation of the Law Against Discrimination, N.J.S.A. 10:5-1 to -42. Plaintiff Candy Rendine recovered a compensatory and punitive damage judgment of $460,000; plaintiff Bernadette Lorestani recovered compensatory and punitive awards of $475,000. Both plaintiffs also recovered prejudgment interest, counsel fees, and costs, in addition to their compensatory and punitive damage awards.
On this appeal, the defendant employer makes these claims of error:
1. The plaintiffs' claims should have been tried separately.
2. The jury instructions on the issues of discrimination and burden of proof were incorrect.
3. The punitive and emotional distress damage awards were not justified.
4. The reasonable attorneys fee lodestar sum should not have been doubled to compensate for the contingency of success or failure.
On the cross-appeal, plaintiffs contend that the trial judge improperly dismissed Rendine's breach of contract claim and Lorestani's wage discrimination claim. We find no merit on either the appeal or the cross-appeal and affirm.

*407 I
Plaintiff Rendine earned a degree in accounting in 1979 and then worked as an auditor and financial analyst with a bank for four years. In 1983 she accepted a position with defendant as assistant controller. Defendant Edward Pantzer was the president and owner of the company and Michael Pantzer (Michael), his brother, was the executive vice-president. In 1985 they hired Steve Weinerman as controller; he was Rendine's immediate superior.
When defendant first interviewed Rendine, he asked her if she had plans to marry and have children "within five years of being married." Rendine answered that she "hoped to be married," but had no plans for children. As assistant controller of residential properties, Rendine supervised "a staff of accountants for accounts receivable, accounts payable, security refund ... [and] payroll." There were about twenty employees at the central office in Tenafly, plus others who worked at the various properties. Rendine was a member of the executive committee, which met weekly and made "all the major decisions of the company." The other members of the committee were the defendant Edward Pantzer, Michael Pantzer, Weinerman, who was Michael's assistant, and Bill Bodger, head of acquisitions.
When Rendine began work, her first assignment was to revamp a six-month old computer system, verifying information about thousands of tenants at numerous properties. She spent some three months visiting the properties in New Jersey, Pennsylvania and Delaware, collecting the information, and then entering it into the computer. She worked every evening until six or seven and sometimes until nine. Rendine also prepared a manual explaining the procedure for entering information into the computer.
In 1984, after Rendine announced her engagement to marry, she said that defendant called her into his office and asked her to polish some silver for him. "[H]e said that since I was getting married and probably going to have silver once I was married, *408 that it would be good practice for me to polish his silver." Rendine politely declined. Defendant denied that this occurred.
With her November annual performance reviews, Rendine received a fourteen-percent salary increase in 1984, fourteen percent in 1985, and eleven percent in 1986. She also received Christmas bonuses for these years of $2500, $1500, and $2500. In January 1986 Michael wrote Rendine a letter, thanking her for doing a good job. Suzanne Rivera, one of the employees whom Rendine supervised, corroborated her competence and ability, and her patience and fairness in dealing with those who worked under her.
Lorestani was hired as a staff accountant to assist Rendine in June 1984. She had five years' experience in bookkeeping or accounting and she earned an accounting degree in 1985. In her job interview, defendant asked her whether she was married, and she said she was engaged. He also asked if she planned to have children. She answered that she "wasn't really thinking at that point about children." Rivera, who was hired in June 1987, was also asked in her job interview about plans to have children.
Lorestani monitored the apartments occupied by defendant's employees, met with Michael each month to review them, and assisted Rendine with the preparation of financial reports. Rendine, who trained Lorestani, thought she was "a very good employee.... She executed all her functions well." Rivera corroborated Lorestani's competence and excellent job performance. Weinerman was also very happy with Lorestani's job performance. Five months after she was hired, Lorestani, whose starting salary was $19,000 a year, received an eleven-percent increment. The following year, 1986, she again received an eleven-percent increment, and in 1987 she received a twelve-percent increment. She also received Christmas bonuses in the amounts of $500 in 1984, and $1000 in 1985 and 1986.
Lorestani's responsibilities increased during the time she worked for defendant. She assumed responsibility for dealing with the managers in the field and took over the cash reconciliations and money-market account activity on about twenty properties. *409 She worked long hours, arriving early in the morning, frequently staying until 7 p.m., and also working on weekends when needed.
Plaintiffs were "inundated" with work, including new properties, and Rendine decided that a bookkeeper should be hired. After consultations with Weinerman and defendant, the bookkeeper position was created. Pam Gaetano was hired in 1987; she worked under Lorestani, who trained her. Rendine evaluated Gaetano, and found her to be "an okay employee." With no math or accounting background, Gaetano "continually had problems understanding ... a bank reconciliation, doing anything that really had to do with math." Although both Rendine and Lorestani "kept on trying to train her extensively," Rendine felt that Gaetano was unable "to take on staff accountant responsibilities."
Another staff accountant, Dominic Battista, was hired in 1985 or 1986 but he left after about a year. When Lorestani began working with defendant, she was assigned to clean the kitchen. However, when Battista was hired, she "noticed that he did not have kitchen duty. So, I talked to Mr. Michael Pantzer and I asked why that was, and he took me off of the kitchen duty instead of putting Dominic on."
Before Battista was hired, Weinerman told Rendine that "he wanted to hire a male for that position, that they really would not consider a female at that time." He told her that:
[I]t would be in the best interests of the company to look for a male because Bernadette and I had recently been married and we were of child bearing age and our, what do they call it, our biological clock was ticking to have children, our time was running out because we were getting older.
The issue of the gender of the new accountant was discussed at an executive committee meeting, where everyone except Rendine agreed with Weinerman's theory. Weinerman denied making this comment.
Rendine was married in December 1984 and purchased a home with a substantial mortgage in October 1985. Her husband's salary was about the same as hers. Both salaries were needed to *410 carry the home. Lorestani was married in May 1985, and purchased a home, with a mortgage, in November 1985. Both Lorestani and her husband had substantial student loans to repay and were supporting her husband's younger sister. Lorestani and her husband were both earning the same salary; both incomes were needed for their support.
In late December 1986 or early January 1987 Lorestani told Michael Pantzer that she was pregnant. She told him that she planned to return to work, and that her sister would take care of her child. "He was very happy for me. He congratulated me." When asked when she would return, Lorestani answered in four or five weeks with a regular delivery, or six to eight weeks if she needed a Caesarean. Lorestani discussed her maternity leave many times with defendant, his brother, Michael, and Weinerman. She repeatedly told each that she planned to return to work when she was physically able. They each assured her that her job would be available on return. Rendine also announced her pregnancy in January 1987 and defendant, Michael and Weinerman all "appeared to be happy for me." She advised them from the outset that she planned to take at least three months' maternity leave, and then return to work. On several occasions, she was assured that "your job will be waiting for you." Rendine testified about an executive committee meeting while she was pregnant, at which her colleagues said that she looked like a "beached salmon." However, defendant and Michael denied that they or anyone else made any jokes or comments about pregnancy in general or about Rendine in particular. Defendant said that he would not tolerate any such remarks, or discrimination in his company.
Dean Delianites, a CPA as of 1985, with four years' experience in public accounting, was hired as commercial accounting manager in November 1986. Rendine saw him leave work early, at 4 p.m. every day, to attend law school. Rivera corroborated that Delianites left work early, adding that Delianites told the staff that he would make up the time "by working through his lunch hour," but Rivera saw him studying law while eating at his desk.
*411 Rendine's duties were divided between Delianites and Weinerman while she was on maternity leave. She had attempted to train Delianites but he was "too busy" and uninterested. Rendine worked with residential buildings, an area in which Delianites had no experience or training. Lorestani and Rendine trained Gaetano to take over Lorestani's duties but Gaetano had difficulty learning the work.
Lorestani started her maternity leave on June 15, 1987, on the advice of her doctor. This was two weeks earlier than planned because she developed toxemia. On her last day of work, she talked to defendant "and he wished me luck, he said he hoped everything worked out fine and he gave me a hug and he told me my job would be waiting for me."
Lorestani delivered by Caesarean on July 13, 1987. Her husband called her office that day, and she called a few days later. Weinerman congratulated her and told her to take as much time off as she needed and said her job would be waiting. Michael also congratulated her, told her that a return to work in six to eight weeks would not be a problem, and also said her job was waiting for her.
Weinerman called her at home the day she was discharged from the hospital, and asked her for a date of return. She told him it would be six to eight weeks, and "[h]e said fine and when I was ready, my job was there for me." Lorestani talked to someone in the office at least once a week during her maternity leave. Weinerman always asked her when she would return, and she always told him six to eight weeks.
In August, when eight weeks passed, Lorestani arranged an appointment with Weinerman to discuss her return. She had made her child-care arrangements, was excited about returning, and brought her baby with her for the appointment with Weinerman. Weinerman "told me that things were running very smoothly and that there was no longer a place for me and he was firing me." Weinerman denied terminating Lorestani on this particular day; rather, when she called in early September to say she was *412 ready to return, he told her on the telephone that he had no job for her. However, Rivera saw Lorestani that day at the office, arriving happy and showing off her new baby. When she left Weinerman's office, she approached Rivera; she was upset and crying, and "she told me she had just been fired."
Meanwhile, Rendine's last day of work was July 24, 1987, and she gave birth early, on July 26. About a week later, Weinerman called and told her that they were promoting Gaetano from bookkeeper to staff accountant. In August 1987 Rendine received a memo from Michael, dated August 19, to all defendant's personnel, advising that as of August 12 Delianites was promoted to the position of assistant controller, and Gaetano was promoted to the position of staff accountant. The memo also announced that Rendine had given birth to a baby girl, and Lorestani to a baby boy. "As soon as their maternity leaves are over, we enthusiastically welcome the return of both Candy and Bernadette to the accounting department."
Rendine was shocked. In her conversation with Weinerman a week before, he had not mentioned Delianites's promotion. She felt that her position with the company was endangered, since there was no need for two assistant controllers. "I was being replaced and I had only been out of work for three weeks." She immediately called Weinerman, who "said that they felt the need to promote these two people."
About a week later Rendine called the office "just to see how everything was going, if anybody needed me." She discovered that "Dean had taken over my desk," including "access to all my personal belongings." She then called Michael, who was "very cold." She was upset because she had always had a fine relationship with Michael, who attended her wedding with his wife.
In October 1987 Rendine met with Michael and Weinerman to discuss her return; she was given a memo entitled "Candy's Responsibilities." She was told that she would retain her title but would no longer have the responsibilities and authority she had before. Her new job was to work on special projects. However, *413 she had already worked on the special projects listed, and they required very little time. Rendine's new job duties were "practically nothing" compared to "the responsibilities I had before I went on maternity leave" and would have taken her about three days a month to complete.
Rendine returned to work on November 11, 1987, after an absence of thirteen or fourteen weeks. Her desk was "isolated from the other employees." It was "right next to the men's bathroom," noisy and filthy dirty. She spent the first day cleaning it. There were no office supplies and no access to the computer. Her "personal belongings were scattered all over the office." No work was assigned to her the first day.
Defendant, who had expressed appreciation for her work just a month before she left, was now very cold toward her, "and I felt like a stranger." Michael, with whom she had worked closely and had a "wonderful working relationship," was also cold. Weinerman, with whom she had had "a friendly, amicable working relationship," was now "very short," talking to her only when necessary. The people in the office whom Rendine had supervised, and whose questions she spent most of her day answering, "wouldn't even talk to me."
Rivera corroborated Rendine's account of her return to work. According to Rivera, Rendine had more knowledge about the residential accounting functions, but Weinerman and Delianites told the staff that Delianites would be handling their questions. Delianites admitted that in November 1987, when Rendine returned from maternity leave, he was still learning her job. Nevertheless, Weinerman reprimanded Rivera and two others for taking their questions to Rendine rather than Delianites.
According to Weinerman, Delianites complained about Rendine's socializing and her job performance. Once, Rendine went onto the computer without checking first, "and it caused a minor problem." On another occasion, when Delianites asked her to correct some journal entries that she had worked on, "she told him she was too busy." Rendine explained that routine office procedure, *414 to return journal entries to the person who wrote them, to review for accuracy, had not been followed.
Early the following week, Weinerman called Rendine into his office. He told her that he had complaints about her, that she had a bad attitude, and that she had better change. He told her that "things ran smoothly when I wasn't there" and that "people were complaining that I was socializing." He talked for five minutes, refusing to listen to anything Rendine had to say. Rendine became angry, because "people had a bad attitude toward me." Weinerman "kept on yelling." Rendine said "I can't take this any more," and "this is not fair." She got up and walked out. Weinerman "told me that if I left, that would be it." When Rendine asked, "does this mean you're firing me?" Weinerman answered "yes," and discharged her.
Weinerman basically corroborated Rendine's account of their verbal encounter, and asserted that he terminated her because she was insubordinate. Defendant, Michael and Weinerman denied any prior discussion, plans or intent to terminate Rendine. Weinerman and Michael denied that their attitude toward Rendine was cold when she returned from her leave, and denied telling staff not to speak with her.
Defendant, Michael and Weinerman all considered Rendine a valuable employee. However, they said she lacked supervisory experience; her interpersonal skills were mediocre; she had difficulty dealing with people; she was unnecessarily "demanding and short with her people," and had conflicts with them.
According to Weinerman, when Delianites took over Rendine's job, the situation in the office improved. Delianites was capable of handling Rendine's responsibilities and did so effectively. "People started working more closely together without problems.... [A] very good working rapport developed in the office. Everybody respected Dean" Delianites.
However, on cross-examination Weinerman admitted that in his last evaluation of Rendine, in 1986, he rated her above average in *415 effectiveness in dealing with others, and in all of the other specific review factors. In contrast, Delianites was not rated any higher than Rendine, and was rated lower than her in leadership. Rivera, who worked under Delianites for four months, thought that "he did not have enough knowledge to run the department well," and she "had to train him" in her field, security deposit refunds.
Weinerman admitted that he agreed to keep Rendine's job open for her, but never "discussed a time frame," and never promised her that her responsibilities would be the same. According to Weinerman, Rendine told him that she was having difficulty finding child care.
Defendant and Michael Pantzer said that the company had a maternity leave policy providing twenty-eight days with pay. The policy was "flexible enough" to allow for a longer leave, but it would be without pay. A maternity leave "would never be openended." The employee must advise the company of the date of her return. Defendant was "certain that either Michael Pantzer and Steve Weinerman and or myself made it clear to Candy that she was going to get a paid four weeks maternity leave and we expected her to be back at the end of that." Rendine denied that she was ever told about this policy.
According to Weinerman, if both Rendine and Lorestani had returned to work within thirty days, they would have been given their prior jobs. However, Weinerman did not intend to demote Delianites and Gaetano. Weinerman explained that since defendant acquired four commercial properties in 1987 and wanted "to bring all of our accounting and management in-house," he determined to create a second assistant controller position, with one assistant responsible for commercial and the other for residential. Rendine and Delianites would be the two assistants. However, Weinerman admitted that he never told Rendine about this plan; he only told her that she would be working on "special projects." Weinerman originally testified that his plan was never implemented because Rendine was terminated. On cross-examination, he *416 said that he abandoned this plan before his meeting with her in October.
Weinerman admitted that he had supervised Delianites elsewhere before coming to work for defendant, that they had stayed in touch, that he brought Delianites into the company, and wanted a chance to promote him. He also admitted that he kept Delianites's promotion a secret from Rendine, that Delianites and Gaetano were the only two people who worked for defendant who were promoted before their annual performance reviews, and that Rendine's job functions were so small when she returned from leave that "it was not a hardship" for the company to discharge her.
As to Lorestani, Weinerman admitted promising her that her job would be kept open but never mentioned any particular period of time, and never promised that it would be kept open indefinitely. Weinerman complained that Lorestani would not give a definite date for her return to work, since she was "still working on" child care.
Weinerman explained that Gaetano was doing both Lorestani's accounting job and her own bookkeeping job, so that there was no need for Lorestani to return. However, he admitted that he hired a new bookkeeper, Lynn Rochford, just days after he discharged Lorestani. Weinerman rated Lorestani higher than Gaetano in their performance reviews, explaining that this was only because Lorestani had more experience.
However, Rivera, who helped train Gaetano, found that she had difficulty with simple bookkeeping and accounting concepts. Gaetano "constantly needed assistance ... to do her job." Gaetano had difficulty dealing with the property managers, and Rivera frequently took their calls and corrected Gaetano's mistakes. Rochford also criticized Gaetano's job performance. Weinerman nevertheless concluded that Gaetano "was as good or better as the staff accountant" than Lorestani.
Defendant claimed Rendine was an insubordinate and unsuitable employee. Defendant claimed that Lorestani was not reinstated *417 because her services were not needed, failed to inform defendant of the time of her planned return, delayed coming back to work, and the operation ran more smoothly without her because of "bad relations with her coworkers."
The defense contended, through defendant Edward Pantzer and Weinerman, that its unwritten policy fixed the length of paid maternity leave at four weeks (plus sick and vacation days) but that it did not limit the allowable length of unpaid leave. In contrast, defendant gave no paid leave for disability beyond sick and vacation days. Weinerman testified that exceptions for unpaid maternity leave were "invariably granted," if an employee provided defendant with a return date and kept him advised of developments.
Defendant produced as witnesses four of his resident managers and three of his leasing agents who took maternity leaves of absence and successfully returned to their positions with defendant. Although three took their maternity leaves after defendant was served with the summons and complaint in July 1989, the other four took their leaves earlier. All seven of these women took no more than six weeks leave, consisting of thirty days with pay plus accrued vacation or personal leave, and all seven worked at the sites of defendant's properties; none worked in the central office. Jeanette Croce, an assistant controller, who did not work in the central office, was allowed to take a maternity leave of eleven weeks in 1991, which included five weeks of unpaid leave. In contrast, plaintiffs' witness, Rivera, took a five-month maternity leave in 1988. Upon her return she found she had much less responsibility than before, and she resigned after two weeks.
Defendant also admitted that he terminated his personal secretary, Kathy Rega, in part because she was unable to work after 5 p.m. Defendant explained that Rega could not work later because she had a part-time job in the evenings. However, at a prior deposition, defendant testified that Rega was unable to work after 5 p.m. because of her family obligations. Defendant's current personal secretary, Mary Beth Chvisuk, had one child when he *418 hired her, and discovered she was pregnant some sixty days later. Nevertheless, he wanted her to return to work after a maternity leave. On cross-examination, he admitted that this occurred after he was served with the summons and complaint in the present case.
The defendant company had four employees in the past few years who were injured or ill; defendant held their jobs open for them, one as long as six months, and did not require them to specify their dates of return. Michael admitted that the difference between defendant's policies for maternity leave and sick leave was that those out on sick leave were not required to come back at a specific time but those on maternity leave were. Also, the employees who were allowed extended sick leave were treated differently from Rendine, in that they were allowed to return to their same positions, with their same responsibilities and authority.
Rendine applied for unemployment compensation benefits. Defendant contested her application. Unrepresented by counsel, she attended a short hearing on her claim. She did not raise her discrimination claim at that hearing because "I didn't think that that was the place to discuss it." The hearing dealt only with her dispute with Weinerman resulting in her termination. The decision was adverse to Rendine, and she took an administrative appeal but lost. She did not appeal further because it would have cost her more than the value of the six weeks of benefits at stake.
Michael refused to give Rendine a reference because she was terminated. Nevertheless, she began looking for a new accounting position immediately after her discharge. She described an extensive job search, consisting of contacting employment agencies, sending out thirty resumes in 1987 and one hundred in 1988, making telephone calls, responding to want ads, and using personal contacts. She was looking for any reasonable salary, including one lower than her earnings from defendant. In 1988 she became pregnant again and stopped looking for work in October of that year. She resumed her job search in January 1989 sending out *419 sixty or seventy resumes, contacting employment agencies, and reviewing want ads. She would have accepted around $25,000 per year, down from the $38,000 she had earned with defendant. Finally, in February 1991, she stopped looking for work, frustrated that she could not find anything. The employment agencies "said the economy was bad, there weren't jobs." Rendine could not afford to accept the minimum wage, because of her child care and other expenses. She intended to resume her job search when her children, ages four-and-a-half and three at the time of trial, went to school.
Rendine described the hardship of losing fifty percent of her family's income. She and her husband had to refinance their mortgage with an adjustable rate. They could no longer pay their bills. Their social life, entertainment, vacations and clothing purchases were adversely affected. They depleted their savings, and borrowed money from Rendine's parents. Rendine said that she changed from "laid back" and "relaxed" to "uptight." She was always worried about paying bills. She and her husband constantly had fights about money. She was sometimes unable to sleep, and had nightmares about her employment experience. She was frustrated, angry and depressed. Rendine lost her self-confidence and self-esteem, and was unable to face her friends. Even at the time of trial, she was still "having a very difficult time just coping with the situation."
Weinerman provided Lorestani with an "okay" but not "great" letter of recommendation and she immediately began looking for work after her termination. She registered with employment agencies, sent out about twelve resumes each month, and looked at the want ads every day. In 1987 she had three or four interviews, but was not offered any work. She became pregnant again in late 1987, but continued to look for work until May 1988. She resumed her job search about two months after her delivery; she again had a Caesarean, and gave birth to twins. Later in 1988 she was hospitalized and unable to look for work. She did not claim lost earnings in this case for her periods of disability.
*420 In 1990 she turned down a job offer for $7 per hour. Later in 1990 she accepted a position as a part-time bookkeeper with a law firm, for $13,000 a year. However, she encountered difficulties there with a hostile co-worker and was forced to resign. In late 1991 Lorestani began working thirty hours per week for $4.50 an hour, and continued at that job through trial.
Lorestani's husband took a second job as a waiter, Monday through Friday nights, and Saturday and Sunday. He went directly from his full-time job, as an engineer, to the second job, arriving home after midnight. Lorestani "felt like I was a single mother" but "was very thankful that he was willing to work that hard." Lorestani's family members purchased clothes and shoes for the children. She was embarrassed and humiliated, "but we needed it." She gained a lot of weight and lost her self-confidence. Before she lost her job, she and her husband frequently entertained in their home. She explained: "After I was fired ... I was just very bitter and very angry and I resented our friends. They all worked and they had kids and they weren't fired.... I became ... not a nice person to be around...."
The jury obviously resolved the conflicting evidence, about whether defendant's sick and maternity leave and employment policy was discriminatorily administered, in plaintiffs' favor.

II
Plaintiffs filed their complaint on June 27, 1989. In count one, Rendine alleged that defendant hired her as an assistant controller in November 1983. She claimed that defendant conditioned her employment on not having children.[1] As noted, in 1987 when *421 Rendine became pregnant and took a leave of absence due to disability; she advised defendant that she intended to return to work. She alleged that, nevertheless, some two weeks later, defendant replaced her with a less-qualified male. When she returned to work, she was "demoted to an inferior position" and despite attempts to perform in her new position, was terminated. Rendine alleged that defendant's actions constituted discrimination on the basis of sex, in violation of the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -42. In count two, Rendine alleged that defendant retaliated against her for becoming pregnant and giving birth, in violation of the LAD.[2]
In count three, Lorestani alleged that she began employment with defendant in June 1984 as a staff accountant, was transferred to the position of residential accounting manager, and performed her duties in a satisfactory manner. She alleged that her employment also was conditioned on her representation that she would not have children. Nevertheless, Lorestani also became pregnant, took a maternity leave, and notified defendant of her intent to return to work. Defendant placed a less qualified woman in Lorestani's position within seven weeks, and terminated Lorestani. She alleged that this constituted discrimination on the basis of sex, in violation of the LAD. In count four, she also asserted that defendant retaliated against Lorestani for becoming pregnant and giving birth, in violation of the LAD.
In count five, both plaintiffs claimed that defendant wrongfully discharged them, in violation of the public policy of the State of New Jersey, which prohibits adverse employment action because of pregnancy and child birth. In count six, plaintiffs alleged that defendant breached oral agreements made to both plaintiffs "that *422 their positions would be held open for them pending their return" to work after maternity leave. In count seven, plaintiffs claimed that they were entitled to two weeks' severance pay. In counts eight and nine, plaintiffs alleged that defendant paid Lorestani less compensation than comparably situated male staff accountants, in violation of the LAD, and in violation of N.J.S.A. 34:11-56.2. Plaintiffs demanded back pay, damages, punitive damages, interest, attorneys' fees and costs, and other appropriate relief.
The assignment judge denied defendant's motion for separate trials. Before trial, plaintiffs moved to strike the affirmative defense of collateral estoppel and res judicata as to the decision of the Department of Labor, Division of Unemployment and Disability Insurance, Appeal Tribunal, disqualifying Rendine for benefits because "she was discharged for misconduct connected with the work." Judge Meehan determined that res judicata precluded Rendine from bringing her claims that her discharge was without cause, in violation of company policy, and that it constituted a breach of contract. However, the judge ruled that Rendine could still bring her claim for discrimination, a claim not addressed in the Appeal Tribunal decision. Plaintiffs later withdrew their claims for retaliation, wrongful discharge in violation of public policy, and severance pay, before trial.
A trial was held before Judge Meehan and a jury on March 9 through March 24, 1992. At the close of plaintiffs' case, defendant moved to dismiss Lorestani's equal wage claim, because of insufficient evidence of the qualifications of the male accountants. The judge reserved decision. Defendant also moved to dismiss Rendine's discrimination claim, arguing that she should have raised it before the Appeal Tribunal. The judge again denied the motion, on the basis of his prior ruling. Finally, defendant moved to dismiss the discrimination claim as to Lorestani, arguing that she had failed to make out a prima facie case because she was replaced by a woman. The judge rejected defense counsel's argument that young mothers and pregnant women are not a *423 protected class and ruled that plaintiffs were entitled to the same treatment as other disabled employees.
At the close of all the evidence, defendant moved for a directed verdict as to punitive damages, arguing that his conduct was not sufficiently egregious to support an award. The judge denied the motion without discussion. However, the judge granted defendant's motion to dismiss Lorestani's unequal pay claim, because no reasonable person could find discrimination on the basis of a comparison of her wages to those of the male staff accountant, Dean Delianites.
The jury found that unlawful discrimination was a substantial contributing factor in the termination of Rendine, and awarded her $210,000 in compensatory damages for lost earnings and personal suffering. The jury also found that unlawful discrimination was a substantial contributing factor in the termination of Lorestani, and awarded her $225,000 in compensatory damages for lost earnings and personal suffering. The jury found that defendant breached his promise to Lorestani that she would be allowed to come back to work, and awarded her $45,000 for damages she sustained as a result of that breach. Finally, the jury determined that both plaintiffs were entitled to punitive damages and awarded $250,000 to each on these claims.
On April 8, 1992 Judge Meehan entered a judgment in favor of Rendine in the amount of $460,000, and in favor of Lorestani in the amount of $475,000, (the $45,000 for breach of contract was deemed included in the compensatory damage award of $225,000) plus prejudgment interest, attorneys' fees and costs for future determination.
Defendant moved for a new trial as to all issues, for remittitur, or for a judgment notwithstanding the verdict. Plaintiffs moved for calculation of prejudgment and post-judgment interest, attorneys' fees, and injunctive relief concerning the content of defendant's or his company's communication to plaintiffs' potential or actual future employers.
*424 The judge heard oral argument on both parties' motions and rejected defendant's contention that the trials of the two plaintiffs should have been severed, finding that there was no prejudice to defendant, that the jury understood it was to consider their two cases separately, and that "judicial economy" called for the combined trial. As to Lorestani, the judge felt that the evidence was "overwhelming" in support of her claim and that she was "a very impressive witness." He found that the $225,000 compensatory award in favor of Lorestani was neither "excessive" nor "shocking," in view of the financial and emotional distress she suffered. As to Rendine, the judge felt that there were "serious factual disputes," which the jury resolved in her favor. He found that her damage award of $210,000 was not excessive, in view of her lost wages and emotional suffering.
The judge upheld the punitive damage awards, on the basis of credible evidence that defendant "knowingly permitted and authorized discrimination against women." The judge denied plaintiffs' request for injunctive relief because he was concerned about future enforcement and noted that the parties had been disassociated for five years.
The judge accepted plaintiffs' attorneys' lodestar sum for prejudgment counsel fees, $114,334.25, as reasonable, and for prejudgment disbursements in the amount of $11,861.25. The judge also accepted plaintiffs' counsel fee claim for post-judgment work, $28,634, plus $9,928.07 in post-judgment disbursements as reasonable. He chose a contingent fee multiplier of two, which he applied only to the actual pretrial and trial aspects of the fee but not to the post-judgment aspect. He also awarded both prejudgment and post-judgment interest.
Defendant moved for reconsideration of the attorneys' fee award. In a written opinion the judge rejected defendant's argument that a contingency fee enhancement was prohibited under the federal Supreme Court's decision in City of Burlington v. Dague, 505 U.S. ___, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Rather, the judge chose to "apply the dissent in Dague," since it *425 was "quite probable" that the New Jersey Supreme Court would do so.
On September 3, 1992 a supplemental final judgment was entered in favor of Rendine in the amounts of $460,000, plus $46,041.40 in prejudgment interest, plus costs to be taxed, and in favor of Lorestani in the amounts of $475,000, plus $49,751.75 in prejudgment interest, plus costs to be taxed. The judgment also provided for total pre- and post-judgment attorneys' fees of $279,091.82, which included disbursements of $21,789.32.

III
Defendant contends that his pretrial motions to sever the claims of the two plaintiffs should have been granted. In his post-trial motions, defendant raised the issue again. The judge noted that each witness, except for two, whose testimony was brief, could have been called to testify in both trials, saying "From the standpoint of judicial economy, there was no sound reason to sever the two cases." The judge found that defendant was not prejudiced by the joint trial. Both before any witnesses were called and in the final charge, he told the jury "that each plaintiff had a separate complaint," which had to be considered "on its own merits." The jury charge and interrogatories both treated the two cases separately. "It was a clear message and I believe the jury fully understood," the judge said.
R. 4:29-1, "Permissive Joinder," provides:
[A]ll persons may join in one action as plaintiffs or be joined as defendants jointly, severally, in the alternative, or otherwise, if the right to relief asserted by the plaintiffs or against the defendants arises out of or in respect of the same transaction, occurrence, or series of transactions or occurrences and involves any question of law or fact common to all of them.
Defendant does not seem to contest that the requirements of this rule were satisfied. Rather he argues that the trials nevertheless should have been separate to avoid "the likelihood of jury confusion or prejudice." In support of his argument, defendant cites R. 4:29-2 and R. 4:38-2(a). R. 4:29-2 provides: "The court may ... order separate trials ... to prevent delay or prejudice." *426 R. 4:38-2(a) provides: "The court, for the convenience of the parties or to avoid prejudice, may order a separate trial of any claim...."
Defendant infers prejudice only by the joinder of the two claims for trial. There is nothing specific in the record to indicate that the judge's conclusion was incorrect. Defendant points to unnecessary complexity of the joint trial, claiming that it was "likely" that the two claims "were not each evaluated on their own merits." According to defendant, the jury had a "natural tendency" to "use all the evidence on both cases together," with a resulting improper, "corroborative effect." This is entirely speculative.
Defendant's only factual support for his claim of prejudice is an alleged "image of a tearful embrace by the plaintiffs." As plaintiffs stress, no such "tearful embrace" made its way into the record. Defendant cites to Lorestani's direct testimony, where she apparently started crying and asked for a tissue, upon which the judge ordered a recess. There was no mention in the record of any embrace at this time and no motion for a mistrial was ever made.
Defendant contends that "plaintiffs' own trial attorney described such scenes for the court," citing plaintiffs' brief in opposition to defendant's post-trial motion. That plaintiffs' brief states:
The Defendant also argues that the Plaintiffs' mutual expressions of support were prejudicial, even though such support appears only once on the trial record; and on that one occasion, the Court merely cautioned counsel to restrain the Plaintiffs in the future since the display of support was of no major consequence.
However, there is no cite to the record by defendant on when this occurred and we find none in our review of the transcripts. In addition, as plaintiffs' brief adds, the severance of the two claims, with the plaintiffs as witnesses at each other's trial, would not have avoided any spontaneous display of emotion or mutual support.
Defendant claims that under N.J.R.E. 404(b) (formerly Evid.R. 55) evidence of other instances of discrimination are not admissible to prove discrimination in a particular case. According *427 to defendant, "the corroborative effect of each plaintiff's claim on the other's" was improper and prejudicial. Defendant relies on two age discrimination cases, Haskell v. Kaman Corp., 743 F.2d 113 (2d Cir.1984), and Moorhouse v. Boeing Co., 501 F. Supp. 390 (E.D.Pa.), aff'd, 639 F.2d 774 (3d Cir.1980).
In Haskell, supra, the Second Circuit ruled that the district court erred in allowing six former company officers to testify about their own terminations and the terminations of other officers. The statistical sample of ten terminations in eleven years was deemed too small "to permit an inference that age was a determinative factor in the employer's decision." 743 F.2d at 121. The court pointed out that five of the terminated officers were replaced with older persons, one was replaced by a person only eight months younger, and two were not replaced at all.
In Moorhouse, supra, the trial court disallowed the testimony of five former employees of defendant, who were plaintiffs in separate cases, regarding their own terminations. 501 F. Supp. at 392-93. The court reasoned that each proposed witness "in essence, would have presented a prima facie case of age discrimination." Id. at 393. In order to rebut this testimony, defendant would have had to justify each layoff, which would result in a trial of "all six cases together with the intendant [sic] confusion and prejudice inherent in that situation." Ibid. Fed.R.Evid. 403, like our N.J.R.E. 403 (formerly Evid.R. 4), allows the exclusion of relevant evidence if its probative value is outweighed by the danger of prejudice or confusion, or of undue delay or waste of time. 501 F. Supp. at 393. The Third Circuit affirmed this exercise of discretion. See also Schrand v. Federal Pacific Elec. Co., 851 F.2d 152, 3155-56 (6th Cir.1988) (age discrimination case, in which testimony of two other employees of defendant, who were also terminated, was inadmissible since they worked remotely from plaintiff, and under different managers).
However, N.J.R.E. 404(b) by exception does allow evidence of other civil wrongs "to prove, for example, motive, intent, plan, knowledge, or absence of mistake or accident." Most federal *428 courts which have considered the issue have concluded that evidence of other acts of discrimination is admissible to prove an employer's motive or intent to discriminate. In Spulak v. K Mart Corp., 894 F.2d 1150 (10th Cir.1990), an age discrimination case, two former employees were allowed to testify about age discrimination against them. In Hunter v. Allis-Chalmers Corp., 797 F.2d 1417 (7th Cir.1986), a race discrimination case, evidence of harassment against other African-American workers was admissible to prove motive and intent. Despite the time-consuming and prejudicial nature of the evidence, it was highly relevant to rebut the defense that plaintiff was fired for cause. Id. at 1423-24. In Estes v. Dick Smith Ford, Inc., 856 F.2d 1097 (8th Cir.1988), a race discrimination case, evidence that defendant excluded African-Americans from its work force, discriminated against African American customers, and referred to African-Americans as "niggers," although highly prejudicial, was admissible to prove unlawful motive, and to disprove defendant's explanation for plaintiff's discharge. Id. at 1102-05. In Conway v. Electro Switch Corp., 825 F.2d 593 (1st Cir.1987), a sex and age discrimination case, evidence that plaintiff and another supervisor were denied salary raises because of their sex was admissible as "circumstantial evidence of a discriminatory atmosphere" and "evidence of a corporate state-of-mind." Id. at 597-98.
Here, there was considerable evidence at trial, regarding discriminatory or fair treatment of other employees. Defendant Edward Pantzer complains, citing Moorhouse, supra, 501 F. Supp. at 393 n. 4, about the prejudicial effect of a "parade of witnesses each recounting his contention that defendant had laid him off because" of age discrimination; but he himself produced a literal parade of no less than eight employees who were permitted to return after short maternity leaves. Evidence of other acts of discrimination, or fair treatment, was properly admitted on the issue of defendant's motive and intent. This type of evidence would have been admissible even if the two cases had been severed for trial.
*429 Moreover, on the propriety of joinder, we explained R. 4:29-1(a) in MacNeil v. Klein, 141 N.J. Super. 394, 358 A.2d 488 (App.Div.), certif. denied, 72 N.J. 455, 371 A.2d 60 (1976):
The aim of permissive joinder is to allow all parties to obtain the largest efficient unit of litigation. The power of the court to sever is a discretionary one, but its guide is the joint policy of avoiding a multiplicity of suits and expediting the determination of legal controversies.
[Id., 141 N.J. Super. at 408, 358 A.2d 488 (citation omitted).]
The phrase "the same transaction, occurrence, or series of transactions," means "successive transactions or at least those of a similar nature." Ibid. They should be "so causally connected or closely allied or related in character or purpose as to constitute components or links in the same evolving complex of events." Ibid. (quoting 2 Schnitzer & Wildstein, New Jersey Rules Service 1040, 1046 (1954)).
Federal courts have determined that more than one plaintiff, alleging the same type of discrimination against the same employer, satisfied the requirement that their causes of action arise out of the same transaction, occurrence, or series of transactions or occurrences, and involved common questions of law or fact. In Mosley v. General Motors Corp., 497 F.2d 1330 (8th Cir.1974), the Court of Appeals reversed an order of the district court severing ten different plaintiffs, bringing an action individually and as class representatives, for race discrimination against their employer and union. Id. at 1334. The Eighth Circuit determined that "a company-wide policy purportedly designed to discriminate against [B]lacks in employment ... arises out of the same series of transactions or occurrences." Ibid. The court found that the existence of such a policy is a fact question common to all members of the class.
On the basis of Mosley, supra, the district court judge in Blesedell v. Mobil Oil Co., 708 F. Supp. 1408 (S.D.N.Y. 1989), denied defendant's motion to sever the trials of three plaintiffs alleging unequal pay and sexual harassment by the same employer. The district court judge again determined that a "company-wide policy purportedly designed to discriminate against females *430 in employment arises out of the same series of transactions or occurrences." Id. at 1422. The district court judge also found that plaintiffs "alleged multiple common questions of law and fact," ibid., and distinguished Moorhouse, supra, involving five former employees, on the ground that Moorhouse was a jury trial, so that "the confusing nature of multiple claims and multiple demands for relief" was relevant. Ibid. In Duke v. Uniroyal, Inc., 928 F.2d 1413 (4th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991), also a jury trial, the Fourth Circuit determined that the district court had not abused its discretion in denying defendant's motion to sever two plaintiffs who alleged that their discharge from employment was discriminatory. Id. 928 F.2d at 1420-21. Both plaintiffs were terminated on the same day "as part of the same reduction in force." Id. at 1420. Thus, the Fourth Circuit concluded that their "claims arise out of the same transaction ... raising common questions of law and fact." Id. at 1421. The instructions, like those given here, charged the jury to consider each plaintiff separately. Ibid. Further, the court rejected defendant's argument, identical to defendant's argument here, that the joint trial was prejudicial because evidence of discrimination as to one plaintiff should not be admissible against the other. Id. at 1420.
Defendant cites only one case involving a severance of parties favorable to him. In Hammons v. Adams, 786 F.2d 1253 (5th Cir.1986), the Fifth Circuit ruled that there was no abuse of discretion in severing the claims of three discrimination plaintiffs. Id. at 1253. The incidents of discrimination as well as the alleged pretexts for discharge were different. The Fifth Circuit said: "The district court decided that the substantial overlap in character and events between these distinct claims presented the possibility of juror confusion, and the appellants have not brought to our attention any serious adverse consequences that resulted from the court's decision." Ibid.
Plaintiffs' right to relief, in the case before us, arises out of the same series of transactions or occurrences. The claims are based *431 on the same company policy which allegedly discriminated against employees who became pregnant and had children. Plaintiffs' maternity leaves here overlapped, and they both were terminated within a period of two to three months. Their terminations were both successive and similar, related in time, in character and in purpose. Since they both alleged discrimination on account of pregnancy, their claims involved common questions of law, as well as fact. We find no abuse of discretion under R. 4:29-1(a) in denial of severance.

IV
Defendant objects to portions of the jury charge as plain error, R. 2:10-2. Defendant complains that the "standard of illegality is far too broad," and failed to require a determination that defendant would have treated plaintiffs differently if they had been disabled for a reason other than pregnancy. Defendant contends that the judge improperly shifted the burden of proof to him and incorrectly charged the jury that it should consider defendant's mixed motives in terminating Lorestani only if it found no pretext in the non-discriminatory reasons defendant advanced for his action. Defendant also contends that the charge explaining the mixed motives analysis was erroneous.
Defendant admits that he failed to raise any of these objections to the charge at trial, but contends that the errors were plain error, clearly capable of producing an unjust result. R. 2:10-2; R. 1:7-2. "A jury is entitled to an explanation of the applicable legal principles and how they are to be applied in light of the parties' contentions and the evidence produced in the case." Navarro v. George Koch & Sons, Inc., 211 N.J. Super. 558, 574-75, 512 A.2d 507 (App.Div.), certif. denied, 107 N.J. 48, 526 A.2d 138 (1986) (citations omitted). The charge as a whole should state the law "correctly and intelligently," so that ordinary jurors can understand it. Gaido v. Weiser, 227 N.J. Super. 175, 199, 545 A.2d 1350 (App.Div. 1988), aff'd o.b., 115 N.J. 310, 558 A.2d 845 (1989). But a party is "not entitled to have the jury charged in words of *432 her own choosing." Id., 227 N.J. Super. at 200, 545 A.2d 1350 (citations omitted).
Here, defendant first complains about the judge's repeated use of the term "substantial factor" in his explanation that each plaintiff must prove that her maternity leave and child birth were a "substantial factor" in her treatment by defendant. Our Model Jury Charges, Civil 2.21A(1) at 4 (May 1991) uses the term "a determinative factor." The judge here used the terms "a determinative factor" and "a substantial contributing factor." In view of the judge's use of these terms interchangeably, we think that no difference was conveyed in meaning between "determinative" and "substantial." Defendant himself requested the use of the word "substantial" in the jury interrogatories and should not complain about its use in the charge. Moreover, the absence of a contemporaneous objection by manifestly competent trial counsel belies the now-alleged significance of this claim of error.
Defendant also objects to the following portion of the charge: "It is unlawful for an employer to refuse to continue the employment of a woman because of pregnancy, delivery of a child or the complications that arise from pregnancy and delivery." Defendant argues that the judge failed to require a comparison between maternity and other disability leaves. Plaintiffs cite Slohoda v. United Parcel Serv., Inc., 207 N.J. Super. 145, 504 A.2d 53 (App.Div.), certif. denied, 104 N.J. 400, 517 A.2d 403 (1986). There, plaintiff alleged that he was terminated from his employment because of marital status; "although he was married to someone else, [he] was cohabiting with ... another UPS employee." Id., 207 N.J. Super. at 148, 504 A.2d 53 (footnote omitted). The trial judge entered an involuntary dismissal because plaintiff failed to "prove that other male and female unmarried UPS employees were permitted to cohabit without interference." Ibid. We reversed, explaining:
The question presented, therefore, is whether the firing was materially grounded in an invidious reason, that is, the fact of his marriage to someone else while maintaining a relationship with Arnett. Plaintiff was free to prove this claim by *433 whatever evidence was available to him. While a showing of differential treatment accorded other employees who were single might be one way of proving such discrimination, it is not exclusive.
[Id. at 148.]
Similarly here, the showing of differential treatment accorded to other employees who were not pregnant was just one, non-exclusive way of proving discrimination. Plaintiffs were not required to make this particularized showing.
Defendant points out that the judge charged the jury with regard to Lorestani, that she "was entitled under New Jersey law to be afforded the same rights and privileges as other sick and disabled people employed by Pantzer Management enjoyed." The judge told the jury to consider:
Were those out on disability leave for other reasons other than pregnancy required to return to work by a set period of time? ... Was their position held for them to return when their disability period ended? .. . Were the rules imposed upon Bernadette Lorestani different than those imposed upon other disabled persons? Were other disabled employees required to put in writing the nature and extent of their disability leave?
According to defendant, this portion of the charge "stops short" of what the jury should have been required to consider: "Was any difference in Lorestani's treatment because her leave was maternity leave, or would she have been treated the same way had she been on leave for some other disability?" However, the judge did charge that pregnant women are entitled to "the same rights and disability leave" as employees disabled for other reasons. Further, the judge's questions specifically dealt with a comparison of Lorestani to "those out on disability leave for ... reasons other than pregnancy." Thus, he did require the jury to consider if Lorestani's treatment was because of her maternity leave, or whether she would have been treated the same way if something other than maternity had disabled her.
Defendant next complains that it was improper to compare his treatment of Lorestani with his treatment of other disabled employees, since the absences of other employees "did not present to defendant the same staffing and organizational considerations presented by the absences of Rendine and Lorestani  an assistant *434 controller and a supervising accountant at the small head office." Defendant freely argued this in summation. Whether he was entitled to treat plaintiffs less favorably than other disabled employees for legitimate business reasons, defendant's major defense, was a fact question for the jury to decide.
Defendant next complains about the judge's instruction to the jury not to consider as a valid defense that defendant was enforcing a "Pantzer management policy that required Bernadette Lorestani to return to work in 28 days plus accrued vacation and sick days." Defendant submits that there was evidence that its policy "was not so restricted." However, the judge clearly charged the jury as to defendant's maternity leave policy: "You have to determine what it was and what areas it covered." Thus, the charge did allow for the possibility that the policy was not restricted to the twenty-eight days plus accrued vacation and sick leave.
Defendant next contends that the judge erred in shifting the burden of proof to him. As defendant concedes, once a plaintiff has proven a prima facie case, the burden of going forward or the burden of persuasion shifts to the employer, who must articulate or come forward with a legitimate, non-discriminatory reason for its rejection or termination of plaintiff. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981); Goodman v. London Metals Exch., Inc., 86 N.J. 19, 31, 429 A.2d 341 (1981). "The plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination." Goodman v. London Metals Exch., Inc., supra, 86 N.J. at 32, 429 A.2d 341. However, "defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Burdine, supra, 450 U.S. at 254, 101 S.Ct. at 1094, 67 L.Ed.2d at 216 (citation *435 omitted) (footnote omitted). The ultimate burden of persuasion "remains at all times with the plaintiff." Id. at 253, 101 S.Ct. at 1093, 67 L.Ed.2d at 215; Goodman, supra, 86 N.J. at 32, 429 A.2d 341. Defendant's allegation that it had mixed motives, "that it would have made the same decision even if it had not allowed gender to play [a motivating] role," is an affirmative defense, and the burden of proof shifts to defendant to prove this contention. Price Waterhouse v. Hopkins, 490 U.S. 228, 244-45, 246-48, 109 S.Ct. 1775, 1787-88, 1790, 104 L.Ed.2d 268, 284, 285-86 (1989).[3]
Defendant point outs that the judge charged, with regard to Lorestani, that if she proved her prima facie case "the burden of then going forward shifts to the defendant and in certain instances the burden of proof in fact in regard to the defense being offered may shift to the defendant." However, the judge did not mean to imply that defendant had the burden to prove, rather than to articulate, legitimate, non-discriminatory reasons for terminating Lorestani. Rather, the judge clearly meant that the burden of proof shifted to defendant to prove its affirmative defense of mixed motives.
The judge did make it clear in his next paragraph that only the burden to articulate its legitimate reasons shifted to defendant.
If you do answer in your deliberations that plaintiff's leave for pregnancy and delivery were a factor in her termination, you must determine whether plaintiff has satisfied her ultimate burden of proving discrimination by the defendant, that is, that they used her pregnancy leave in determining whether or not she could continue employment. If she has met that burden, it is the burden of the defendant to articulate, that is, to set forth to you the legitimate and nondiscriminatory reason for the failure to permit Mrs. Lorestani to resume her former position. The defendant maintains they promoted Pam Gaetano to the plaintiff's former *436 position and did not need the plaintiff any longer. You will have to evaluate that contention and deal with whether or not you consider that to be truthful or not.
Defendant argues that the last-quoted sentence reinforces the impression that defendant had the burden of proof. However, the judge made it clear that at this point defendant had only the burden to articulate his reason. The judge later repeated that the burden of proof was on plaintiff to prove discrimination. "To prove pretext the plaintiff must show by a preponderance of the evidence that the defendant's reason is not worthy of belief." The judge repeated: "[P]laintiff must prove by a preponderance of the evidence that her protected status, that is, a woman out on maternity leave, was a substantial factor in the treatment that she is challenging here."
Defendant's final appellate objection to the charge involves the mixed motive charge; defendant claims that he was required to prove the absence of pretext twice, and that the charge effectively directed a verdict against him. Defendant objects to the following portion of the charge:
So, if you find that the reason being advanced is a pretext, you should then answer the question yes in favor of plaintiff and against the defendant. [Jury interrogatory four: "Was unlawful discrimination a substantial contributing factor in the termination of the plaintiff, Bernadette Lorestani?"]
If you find that the reason being offered, the non-discriminatory reason being offered is not a pretext, then you must proceed further because if in your deliberations you determine that the defendant's actions were a product of a mixture of legitimate and wrongful reasons, then the burden is placed upon the defendant to prove by a preponderance of the evidence that it would have made the same decision even if it had proceeded to not take into account the plaintiff's protected status.
Defendant argues that Lorestani was provided with a second opportunity to prove that defendant's reason was pretext. Defendant claims the mixed motive analysis applies, and the burden of proof shifts to defendant, "only after a plaintiff has proven intentional discrimination." However, if defendant's reason is not a pretext, it is still entirely possible that defendant had both proper and improper reasons for its action. Thus, the mixed motive analysis is applicable. On the other hand, if defendant's reason is pretext, then there is no proper motive to serve as part of the *437 mixed motive analysis. In this situation, there is nothing to which to apply the mixed motive affirmative defense. The jury was charged, in accordance with Model Jury Charges, Civil 2.21A(2) at 5 (February 1992), that it was to consider defendant's defense of mixed motives only if it determined "that the defendant's actions were a product of a mixture of legitimate and wrongful reasons." Thus, if it found the absence of "wrongful reasons," it was not to proceed with that portion of the charge. The judge had previously charged the jury: "If you were to find that Bernadette Lorestani's being on maternity leave had no role in her termination, you should answer question number three no, proceed no further and return your verdict." (Clearly, the judge here meant question four.) Thus, the jury knew that it was not to continue with its deliberations and reach the issue of the mixed motive defense, unless Lorestani had shown a discriminatory motive. The mixed motive charge, as given, which was in accord with the Model Jury Charges, Civil 2.21A(2) at 5, did not give plaintiff a second chance to prove her case.
Defendant objects to the sentence following the portion of the charge above-quoted: "That is, if they had taken that [plaintiff's protected status] into account, they still would have terminated Bernadette Lorestani's employment." We agree that this statement was incorrect. The judge, seemingly and inadvertently, omitted a negative. The defense is whether if defendant had not taken plaintiff's protected status into account, he still would have terminated Lorestani. However, this error does not necessarily taint the entire charge, because immediately after this the judge corrected himself:
The burden of proof on that is upon the defendant to prove that, in assessing whether Mrs. Lorestani's protected status played a motivating factor in the decision to not permit her to resume her former position, if you had asked the employer at the moment of the decision what were the reasons and if you have received a truthful reply, would one of those reasons have been that plaintiff was in that protected class.
Thus, reading the charge as a whole, it contained a correct statement of the law. Gaido v. Weiser, supra, 227 N.J. Super. at 199, 545 A.2d 1350.
*438 In conclusion, the jury received a correct and understandable "explanation of the applicable legal principles," as required by Navarro v. George Koch & Sons, Inc., supra, 211 N.J. Super. at 474-75, 512 A.2d 507. We see nothing in the charge clearly capable of producing an unjust result. The absence of any contemporaneous objection by able trial counsel fortifies our conviction. We are satisfied that the jury instructions, considered as a whole, were quite adequate.

V
Defendant contends that plaintiffs' claims for emotional distress should not have been submitted to the jury. Even conceding there was some evidence to support these claims, defendant asserts that only nominal recoveries for this element were justified. The judge found that the compensatory damage awards were not excessive (Rendine $210,000; Lorestani, $225,000). He observed that:
This Court is no better qualified than the jury to put a value on another's pain and suffering, emotional distress and harm that she endured. It certainly was substantial and serious. The economic suffering she has endured was devastating to her and to her family. Her husband had to work two jobs just to keep the bill collectors off the doorstep.
Lorestani's earnings after her termination decreased substantially, and four years later she was able to earn only about one-quarter of her prior wages. The judge said: "[T]his is just the type of damages that the Law Against Discrimination permits recovery for." He was not "shocked by the award," but rather agreed that it compensated Lorestani for the harm defendant caused, stating "[d]efendant's conduct has, for all practical purposes, removed the plaintiff from that portion of the employment market for which she worked hard to train herself."
The judge observed that Rendine claimed $90,000 in lost wages. Again, he felt that "the jury is as well qualified as the Court to determine what is fair and adequate compensation." The judge noted her emotional suffering and distress, and the financial hardships for her and her family. "Also, Rendine was on a fast *439 track and clearly had plans to move ahead in the business world. All of this has been dashed...." The judge concluded that her compensatory damage award was "fair, just and adequate," and supported by the evidence.
According to defendant's analysis, Lorestani's award of $225,000 included $180,000 for emotional distress. Defendant assumes that the jury awarded Lorestani $45,000 on her breach of contract claim. The jury was instructed that her claim for loss of wages was identical under both her breach of contract and discrimination actions, and that there would be no double recovery. Defendant thus deduces that the jury would not have awarded her more than $45,000 for her lost wages under her discrimination claim.
In summation, plaintiffs' attorney requested $99,000 for lost wages for Lorestani, projecting her earnings from the time of her dismissal until she obtained her new job in 1991, but also deducting amounts for her actual earnings in that time, for the times that she was disabled and not looking for work, and for the taxes she would have paid.
As to Rendine, defendant speculates that her award of $210,000 included "a minimum of $105,000 for emotional distress," noting that she requested $105,000 in economic damages. Plaintiff's attorney calculated $105,000 by projecting her wages from the time of dismissal until 1991, when she stopped looking for work, deducting the three months that she was disabled when she had her second child and what she would have paid in taxes. The sum of $2,000 for lost medical coverage also was included. Defendant candidly admits that the "actual allocation by the jury is impossible to determine."
The Legislature has specifically authorized recovery for the type of emotional distress plaintiffs claimed. N.J.S.A. 10:5-3 provides:
The Legislature further finds that because of discrimination, people suffer personal hardships, and the State suffers a grievous harm. The personal hardships include: economic loss; time loss; physical and emotional stress; and in some cases severe emotional trauma, illness, homelessness or other irreparable harm resulting from the strain of employment controversies; relocation, search and *440 moving difficulties; anxiety caused by lack of information, uncertainty, and resultant planning difficulty; career, education, family and social disruption; and adjustment problems, which particularly impact on those protected by this act. Such harms have, under the common law, given rise to legal remedies, including compensatory and punitive damages. The Legislature intends that such damages be available to all persons protected by this act and that this act shall be liberally construed in combination with other protections available under the laws of this State.
This provision was effective on April 16, 1990, but "shall apply to any action pending on that date." L. 1990, c. 12, § 5. Plaintiffs' action was filed in 1989 and was pending in April 1990. The Statement of the Assembly Judiciary, Law and Public Safety Committee on c. 12 of L. 1990 cogently expressed the purpose of the amendment: "This bill would also add language to the findings section of the LAD listing the hardships (i.e., economic loss, emotional trauma) which victims of discrimination might suffer and language indicating that the LAD is to be liberally construed so that all common law remedies, including compensatory and punitive damages, are available to persons protected by the LAD." (Assembly, Nos. 2872, 2118 and 2228, L. 1990, c. 12).
Although defendant's discriminatory treatment did not cause plaintiffs to relocate or suffer illness or homelessness, both plaintiffs described in detail their inconvenience and economic loss, physical and emotional stress, anxiety in searching for reemployment, uncertainty, career and family disruption and other adjustment problems. Plaintiffs' problems seem precisely the type for which the Legislature intended compensation. See Catalane v. Gilian Instrument Corp., 271 N.J. Super. 476, 499-501, 638 A.2d 1341, 1353-54 (App.Div. 1994); Bolden v. Southeastern Pennsylvania Transportation Authority, 21 F.3d 29, ___ (3d Cir.1994).
As to the amount of the award, the Supreme Court in Baxter v. Fairmont Food Co., 74 N.J. 588, 596-97, 379 A.2d 225 (1977) (citations omitted), explained:
[A] trial judge should not interfere with the quantum of damages assessed by a jury unless it is so disproportionate to the injury and resulting disability shown as to shock his conscience and to convince him that to sustain the award would be manifestly unjust.

*441 ....
The judgment of the initial factfinder ... is entitled to very considerable respect.
The standard for appellate review is the same, except that the trial judge's "feel of the case" is entitled to deference. Id. at 600, 379 A.2d 225. The trial judge here was not shocked by the compensatory awards; he did not consider them excessive in view of the evidence. His determination, as well as that of the jury, are entitled to considerable appellate deference.
Defendant relies mainly on Jackson v. Consolidated Rail Corp., 223 N.J. Super. 467, 538 A.2d 1310 (App.Div. 1988). There, plaintiff was discharged from his employment because of "egregious racial prejudice." Id. at 474, 538 A.2d 1310. The judge felt that punitive damages were unwarranted, but agreed to submit the issue of punitive damages to the jury after its verdicts on liability and compensatory damages, to avoid a retrial after appeal. Id. at 470-73, 538 A.2d 1310. During deliberations, the jury asked whether, if it awarded plaintiff damages for mental suffering, "would we then additionally have to determine punitive damages," to which the judge answered in the affirmative. Id. at 473, 538 A.2d 1310. The jury returned a verdict for plaintiff for $600,000 in compensatory and $1,000,000 in punitive damages.
This court agreed with the trial judge that the compensatory damage award was "so disproportionate to the injuries described by the plaintiff as to constitute a manifest injustice and shock the conscience." Ibid. A psychologist testified for plaintiff that he suffered from a personality or mood disorder caused by depression over his discharge, and that he suffered permanent psychological damages. Id. at 476-77, 538 A.2d 1310. However, plaintiff had seen the psychologist only twice, five years after his discharge. Id. at 476, 538 A.2d 1310.
In the case before us, defendant complains that neither Rendine nor Lorestani sought any treatment or counseling. However, they both explained that they did not because they could not afford treatment. In Jackson, supra, plaintiff lost only $16,500 in wages, and was reinstated to his position after approximately eight *442 months. 223 N.J. Super. at 476, 538 A.2d 1310. In the case before us, in contrast, neither plaintiff was ever reinstated, and both were unable to obtain jobs that were at all comparable, up to the time of trial. Thus, not only were their lost wages claims significantly higher than Jackson's but the damage to their careers and personal lives was extensive.
Moreover, in Jackson, supra, unlike here, one of the principle reasons for overturning the award was that because of the jury's question during deliberations, the court was concerned "that the jury may well have `penalized' defendant when considering compensatory damages." Id. at 481, 538 A.2d 1310. Here, in contrast, there is neither any indication nor does defendant contend that the compensatory damage award of either plaintiff might have been tainted with punitive considerations.
Defendant also complains that there was no expert testimony or objective corroboration of plaintiffs' claims. Defendant has submitted no authority to us that requires either expert testimony or objective corroboration for a pain and suffering award in a discrimination case. Defendant cites Decker v. Princeton Packet, Inc., 116 N.J. 418, 561 A.2d 1122 (1989) (false obituary), an action at common law for defamation and negligent infliction of emotional harm, and Buckley v. Trenton Saving Fund Soc'y, 111 N.J. 355, 544 A.2d 857 (1988) (wrongful dishonor of check), also an action at common law for intentional infliction of emotional harm, both relatively unfavored causes of action and very different from the statutory discrimination claims here. In Buckley, supra, the Court explained that the compensable emotional stress must be "so severe that no reasonable man could be expected to endure it." 111 N.J. at 366, 544 A.2d 857 (citations omitted). In a discrimination case, in contrast, the Legislature has set forth a far more lenient or generous standard for compensation. N.J.S.A. 10:5-3.

VI
Defendant next contends that the judge erred in submitting the issue of punitive damages to the jury, because there was "no evidence of malicious or egregious wrongdoing by defendant." *443 Before the charge to the jury, defendant moved for a directed verdict as to punitive damages, which the judge denied without discussion. However, the judge gave reasons for denying defendant's post-trial motion on this issue. He determined that there was credible evidence in the record that defendant "knowingly permitted and authorized discrimination against women." The judge pointed out that defendant discharged his secretary because she had to leave at 5 p.m. to take care of her children, while he allowed Delianites, "who had a much more responsible position than the secretary," to leave early to go to law school. The judge pointed out that there was evidence that defendant personally assured both plaintiffs that their positions would be open for them when they returned from maternity leave. There was evidence that defendant had very substantial control over his company, even down to his attention to a dirty refrigerator in the lunchroom.
As to Rendine, the judge felt that the jury "had a right to find ... that she was set up to cause a confrontation in order to fire her," and further that defendant "knew of the scheme, approved of it, and let certain rules be made in order that the event could take place." The evidence permitted the jury to make such an inference. The judge added that if the jury "found the other way I wouldn't upset it either."
More than negligence is required for an award of punitive damages. In Nappe v. Anschelewitz, Barr, Ansell & Bonello, 97 N.J. 37, 49-50, 477 A.2d 1224 (1984), the Court explained:
To warrant a punitive award, the defendant's conduct must have been wantonly reckless or malicious. There must be an intentional wrongdoing in the sense of an "evil-minded act" or an act accompanied by a wanton and wilful disregard of the rights of another.... The key to the right to punitive damages is the wrongfulness of the intentional act.... Moreover, it is especially fitting to allow punitive damages for actions such as legal fraud, since intent rather than mere negligence is the requisite state of mind.
As plaintiffs point out, intent is the generally requisite state of mind for an employment discrimination action under the LAD. *444 Actionable sex discrimination is rarely simply careless or inadvertent. In Goodman v. London Metals Exch., Inc., supra, the Court stated that "discriminatory motive or intent" is "a crucial element in a discrimination case." 86 N.J. at 30, 429 A.2d 341. The judge's charge was in accordance with these requirements. He used the terms "actual malice ... intentional wrongdoing, and evil minded act ... wanton and wilful disregard of the rights of others."
The judge carefully charged the jury that punitive damages could not be assessed against defendant for the acts of his employees, unless defendant himself authorized or directed them, or at least agreed with and acquiesced to them. This is in accord with the explanation recently rendered in Lehmann v. Toys `R' Us, Inc., 132 N.J. 587, 625, 626 A.2d 445 (1993): "Hence, the employer should be liable for punitive damages only in the event of actual participation by upper management or willful indifference."
We agree with plaintiffs and the judge that there was sufficient evidence of both defendant's personal involvement and intentional, malicious actions. As to his personal involvement, Rendine testified that defendant "was involved with everything that went on in the office, the day-to-day operations, everything." He was not only concerned about moldy food in the refrigerator, but was involved in the office renovations, and the personal supplies of individual employees. Rendine also testified from her personal knowledge that defendant had to approve all personnel hirings and terminations.
Lorestani also testified that defendant "was involved in every aspect of the company." For example, after Lorestani was terminated, defendant wrote her a personal letter asking her to return her office key. Defendant's involvement in personnel matters is also indicated in Rendine's testimony that whenever she interviewed a job applicant, defendant would ask her if the applicant had small children. When Rendine needed a bookkeeper and created the new position, she had to discuss this matter first with *445 defendant as well as Weinerman. When Rendine discharged an employee she had supervised, she discussed this with defendant first. Finally, both plaintiffs testified that defendant personally promised them that they would be allowed to take maternity leaves. Defendant's personal immersion in the details of management was pervasive.
There was also considerable evidence of malice and intentional wrongdoing by defendant. When Weinerman announced at an executive committee meeting that the new accountant should be a male because plaintiffs were of child-bearing age and their "biological clock was ticking to have children," defendant allegedly agreed. Rivera heard defendant comment that women with children were unreliable. Defendant once demeaningly asked Rendine to polish the silver in his office. When Rendine returned to work, defendant was very cold toward her, in contrast to his expressed appreciation of her shortly before she left.
There was ample evidence for the jury to conclude that the dismissal of Rendine for insubordination was intentionally and maliciously contrived. Rendine's assigned desk on return was isolated, filthy and in a noisy location; she had no supplies, no computer access, and her personal belongings were gone. Michael, Weinerman, and Delianites, as well as defendant, were cold toward her. She felt "like I had a social disease." Employees whom Rendine had previously supervised were directed to take their questions to Delianites, although Rendine had more experience in residential accounting. Rivera and others were reprimanded for taking their questions to Rendine.
Weinerman's explanation for his stripping Rendine of her responsibilities could well have struck the jury as inherently incredible. Weinerman said that he intended to have two assistant controllers, Rendine and Delianites, one responsible for commercial accounting and the other for residential. However, these were not the job duties he gave her upon her return; rather, he assigned her to develop methods to utilize the computer system. Weinerman was unclear as to who then was to supervise residential *446 and who was to supervise commercial accounting. He never told Rendine about this plan nor did he ever actually implement it. At one point he testified that he abandoned this plan before Rendine returned to work. Weinerman also admitted that he kept Delianites's promotion a secret from Rendine, and that Rendine's job functions were so minor when she returned that "it was not a hardship" ultimately for the company to dispense with her. In the end, as to the confrontation between Weinerman and Rendine, Weinerman admitted that he did not allow her to state her side of the story or her explanation, because he was not interested. Weinerman "expected her to react that way."
The jury clearly found unlawful discrimination a contributing factor in the termination of Rendine and Lorestani. The jury could reasonably have found this discrimination was intentional, inspired because they became pregnant and gave birth. "Our cases indicate that the requirement [for willfulness or wantonness] may be satisfied upon a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." Berg v. Reaction Motors Div., 37 N.J. 396, 414, 181 A.2d 487 (1962); Potter v. Village Bank of New Jersey, 225 N.J. Super. 547, 563, 543 A.2d 80 (App.Div.) ($100,000 punitive award for retaliatory discharge), certif. denied, 113 N.J. 352, 550 A.2d 462 (1988); see Levinson v. Prentice-Hall, Inc., 868 F.2d 558 (3d Cir.1989) (punitive damages allowable for employment discrimination under New Jersey's LAD). The jury had ample evidence to support its determination that the discrimination against both plaintiffs was not only intentional wrongdoing but also malicious or "evil-minded."

VII
The final point on defendant's appeal involves the assessment of counsel fees under the fee-shifting mechanism of the LAD, *447 N.J.S.A. 10:5-27.1.[4] Defendant first objects to the use of a contingency multiplier, doubling plaintiffs' attorneys' fee claim. Defendant also contends that even if the two-times multiplier was proper, it should not have been used here because plaintiffs' retainer agreement was not fully contingent.
N.J.S.A. 10:5-27.1 provides that in any action brought under the LAD, "the prevailing party may be awarded a reasonable attorney's fee as part of the cost." The judge accepted counsel's "lodestar" calculations as reasonable. The "lodestar" is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. Silva v. Autos of Amboy, Inc., 267 N.J. Super. 546, 556, 632 A.2d 291 (App.Div. 1993). A total of 646.65 attorneys' hours were expended, at rates of $225 and $175 for partners, $165 for senior associates, including Ira Weiner, who tried the case, and $150 to $115 for junior associates; the total came to $114,334.25, plus $11,861.25 in disbursements. Certifications of several experienced employment and labor relations attorneys justified both the amount of time spent and the hourly rates. The judge also awarded post-judgment counsel fees of $28,634, and post-judgment disbursements of $9,928.07, which included the fee for an expert on attorneys' fees, Peter Van Shaick. Defendant did not contest the reasonableness of these amounts.
On February 24, 1988 plaintiffs entered into a partial contingent-fee agreement with their attorney, Elliot Baumgart. The fee would be the greater of (1) half of the then-current billing rate for himself, or $75 per hour, and for his associate, Ira Weiner, $62.50 per hour, plus twenty-five percent of plaintiffs' recovery, or (2) attorney's fees awarded by the court pursuant to the statute, "if we should prevail at trial." Later that year Baumgart merged with Rabner, Allcorn and Widmark, P.C., which later became Rabner, Allcorn and Meislik, P.C., the firm representing plaintiffs *448 at trial. Plaintiffs were also to pay and did pay a retainer in the amount of $5,000.
Plaintiffs' retainer eventually was "exhausted on disbursements," and later plaintiffs were able to pay their attorneys only $2,750 more. According to trial counsel Ira Weiner, plaintiffs' individual and marital assets were meager, and if they had lost at trial, they probably "would have taken advantage of their rights under the Bankruptcy Act to avoid additional payments to the firm." Nevertheless, his firm decided to continue to represent them "on what had in reality become a completely contingent basis."
The judge agreed, saying:
If plaintiffs had lost at trial, it is unlikely that counsel would have been able to collect the reduced hourly fees and the balance of costs....
This Court is satisfied that plaintiffs' arrangement with counsel was, if not by design but certainly by the practicality, on a contingent fee basis.
We also agree. Realistically, this was a contingent fee case with the client advancing a portion of the expenses.
Defendant points out that plaintiffs' attorneys "did not waive their right to pursue collection based on their hourly rates" and further alleged that "the relevant inquiry" is the initial agreement, not what occurred later. Defendant cites Casino v. Mahopac Cent. School Dist., 741 F. Supp. 1028, 1036 (S.D.N.Y. 1989), a handicap discrimination case, in which the court refused to enhance the counsel fee because "enhancement is inappropriate where the client retains and pays the attorney on a quantum meruit or hourly charge basis and then runs out of money." In Casino, however, the fee agreement was entirely on an hourly basis. Id. at 1033-34. Unlike here, there was no reduced hourly rate or partial contingency. In addition, Casino had paid his attorney's bills regularly until March 1989 (suit was filed in June 1988). Even in March 1989 Casino paid $15,000 toward a $30,309.20 bill, even though he was unemployed. Id. at 1036. Here, in contrast, plaintiffs made only one payment towards expenses after their original, modest retainer was exhausted on expenses. *449 Unlike in Casino, here, quite early in the case the original, mostly-contingent, fee agreement had become completely contingent.
The issues of the effect of a contingency agreement and the enhancement of the lodestar have been consistently controversial. In Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley II), 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987),[5] the federal Supreme Court reversed an enhancement for contingency of success to an award of counsel fees under the Clean Air Act, 42 U.S.C.A. § 7604d. 483 U.S. at 713-15, 107 S.Ct. at 3080-82, 97 L.Ed.2d at 590-91. The Court noted that the § 304d provision for reasonable attorneys' fees was analogous to the Civil Rights Attorney's Fees Awards Act, 42 U.S.C.A. § 1988, and said that the same principles and case law govern both. 483 U.S. at 713 n. 1, 107 S.Ct. at 3080 n. 1, 97 L.Ed.2d at 590 n. 1. In a four-one-four split, the plurality opinion of the Court, written by Justice White, generally disapproved enhanced compensation under fee-shifting statutes which recognized the risk of loss and thus possible nonpayment of counsel fees in these cases, but the Court concluded that "if the trial court specifically finds that there was a real risk-of-not-prevailing issue in the case, an upward adjustment of the lodestar may be made," but not more than one-third of the lodestar. 483 U.S. at 730, 107 S.Ct. at 3089, 97 L.Ed.2d at 601. The four-judge dissent, citing the amicus curiae brief for the American Bar Association, offered some guidance regarding the effect of an attorney-client agreement on a possible contingency enhancement.
A court first must determine whether an attorney has taken a case on a contingent basis.... The court also must determine if an attorney has been able to mitigate the risk of nonpayment in any way. For example, if a client has agreed to pay some portion of the lodestar amount, regardless of the outcome of the case, the attorney has mitigated the risk of loss to some extent, although the percentage of total expenses paid by the client will indicate how much of a mitigating factor this contribution should be considered to be. Or, for example, if the attorney has *450 entered into a contingent-fee contract in a suit seeking substantial damages, the attorney again has mitigated the risk of nonpayment to some extent by exchanging the risk for the prospect of compensation greater than the prospective lodestar amount.
[483 U.S. at 748-49, 107 S.Ct. at 3098-99, 97 L.Ed.2d at 612-13 (citation omitted).]
In the case before us, plaintiffs agreed to pay a portion of the lodestar amount, regardless of the outcome of the case, in addition to the $5,000 retainer. Because the amounts they actually could pay did not even cover disbursements, that hourly agreement cannot realistically be considered a mitigating factor. The judge was correct that "if not by design but certainly by the practicality" this was a contingent fee.
The judge in the case before us did not consider whether plaintiffs' attorneys mitigated their risk of nonpayment by entering into a partial contingent-fee agreement. Justice White in Delaware Valley II observed that when plaintiffs' attorneys exchanged the "risk of non-payment for the prospect of compensation greater than the prospective lodestar amount," 483 U.S. at 749, 107 S.Ct. at 3099, 97 L.Ed.2d at 613, this must be considered a mitigation of the risk of nonpayment "to some extent." Ibid. On the propriety of fee enhancement for contingency of success, Judge Meehan here actually followed the concurring opinion of Justice O'Connor in Delaware Valley II, supra, which several courts of appeal had recognized as the holding of the case, see, e.g., Blum v. Witco Chemical Corp., 829 F.2d 367, 379 (3d Cir.1987). Justice O'Connor agreed with the dissent that contingency of outcome itself could be considered in determination of a reasonable fee under the fee-shifting statutes. 483 U.S. at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601. She also agreed that "compensation for contingency must be based on the difference in market treatment of contingent fee cases as a class, rather than on an assessment of the `riskiness' of any particular case." Ibid. She explained that this would avoid "[h]aphazard and widely divergent compensation for risk." 483 U.S. at 733, 107 S.Ct. at 3090, 97 L.Ed.2d at 602.
*451 Justice O'Connor required that the fee applicant prove "the degree to which the relevant market compensates for contingency." 483 U.S. at 733, 107 S.Ct. at 3090-91, 97 L.Ed.2d at 602 (citations omitted). The fee award should be enhanced only as much as "necessary to bring the fee within the range that would attract competent counsel," and the applicant must prove that she "would have faced substantial difficulties in finding counsel in the local or other relevant market." Ibid. (citation omitted) (quoting the opinion of the Court, 483 U.S. at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601). In accordance with these guidelines expressed by Justice O'Connor, Judge Meehan found:
This Court is satisfied with the proofs submitted by plaintiffs' counsel in support of the fee application. Plaintiffs demonstrated that they went to 12 different attorneys before Mr. Weiner's firm agreed to take the case. Counsel submitted several certifications from attorneys which established the risks involved in contingent fee litigation. Due to these risks, firms generally will not accept contingent fee cases. Certifications from several attorneys reveal[] that firms will only take contingent cases upon belief that they will recover the hourly rate plus a premium, a substantial premium, to compensate for the risk of a nonpayment or underpayment.
The judge rejected plaintiffs' attorney's request for a multiplier of 2.5, choosing instead 2.0 which reflected "the appropriate differences in the market treatment," and was "consistent with the evidence presented."
Defendant does not contest the judge's factual findings, based on unrefuted evidence in the form of affidavits. According to plaintiff Lorestani, both "Gloria Allred, the well-known women's rights attorney out of California, and Nadine Taub, head of the Rutgers Law School Women's Rights Clinic" declined to take their case. Other attorneys demanded hourly rates or retainers which plaintiffs could not afford. Plaintiffs "first learned about Mr. Weiner when we paid the Bergen Record to search its archives and it found another pregnancy discrimination case Mr. Weiner had won."
Glen Savits, a senior associate at Wilentz, Goldman & Spitzer, P.C., responsible for presenting new employment matters to the firm's screening committee, recommended contingent cases to his *452 firm only when the expected damages are at least $100,000, and the specials are at least $50,000. His firm requires a contingent fee agreement for two times the current hourly fee or a percentage of the recovery, whichever is greater. Savits considers two and one-half times his hourly rate on successful cases as "the minimum necessary to remain in the business of litigating contingent employment law cases," without which competent counsel would not accept them. Nevertheless, his firm "is not yet convinced that contingent employment cases are economically viable in the long run."
Wayne Positan, managing partner of Lum, Hones, Conant, Danzis & Kleinberg, and head of the firm's labor and employment group, receives "a constant stream of requests to review prospective plaintiffs' cases." His firm no longer accepts plaintiffs on a contingency basis, "[b]ased upon our experiences in the area, coupled with our overall philosophy of representing management." Positan notes that many employers will vigorously defend, and the time commitment and risk of loss are substantial. Colleagues to whom he has referred cases are also "exceedingly reluctant to take pure contingency cases."
Martin Aron, a member of Budd, Larner, Gross, Roseman, Greenberg & Sade, P.C., who specializes in employment and labor relations law, is also "extremely conservative in choosing contingent employment cases," and takes them only if he believes "our firm will recover its hourly rate plus a substantial premium for risk of nonpayment or underpayment." To attract Aron as counsel, prospective plaintiffs must have "excellent proofs on the merits," and substantial damages, as well as be willing to sign an agreement providing for an hourly fee or a percentage of the recovery, whichever is greater, after successful litigation or settlement. According to Aron, "until substantial contingent multipliers are routinely granted as part of fee awards by the courts in statutory employment cases, the rights established by those laws will remain unenforced, particularly when it comes to small damage cases."
*453 Finally, Peter Van Schaick, whose practice is limited to equal employment and wrongful discharge cases, and as plaintiffs' expert on reasonable attorneys' fees, opined that prospective plaintiffs in employment cases, even with claims for substantial damages, have extreme difficulty in finding competent counsel in the New Jersey legal market. In his opinion, "to a reasonable degree of professional certainty, a multiplier of 2.5 is the minimum necessary to attract competent counsel in New Jersey to take contingent employment cases."
We recognize that there is substantial support for defendant's argument that any fee enhancement for contingency may be inappropriate. In Chattin v. Cape May Greene, Inc., 243 N.J. Super. 590, 581 A.2d 91 (App.Div. 1990) (Judge Brody dissenting in part), aff'd o.b., 124 N.J. 520, 591 A.2d 943 (1991), a consumer fraud case, we disapproved an award of attorneys' fees, including a twenty-five percent enhancement, under N.J.S.A. 56:8-19 which, like N.J.S.A. 10:5-27.1 and the federal fee-shifting statutes, provides for reasonable attorneys' fees for claimants. Id. at 610-17, 591 A.2d 943. Chattin is in no sense binding authority on us on the issue of multipliers for counsel fees despite the Supreme Court's affirmance on the opinion of this court. In Chattin, neither plaintiffs' brief in support of their appeal as of right, nor defendants' cross-petition for certification raised the issue of counsel fees. There was a concurrence and a dissent in the Supreme Court; neither opinion raised or discussed the issue of counsel fees in the Court. The issue of fee enhancement clearly was not before the Supreme Court in Chattin.
The award of attorneys' fees in Chattin was found improper by a Panel of this court, first, because counsel's allocation of the time spent on claims against the defendant and a co-defendant, against whom no fee could be awarded, was "conclusionary, lacking in any supporting detail." Id. at 614, 591 A.2d 943. In addition, the attorney's time charge included hours spent on other claims, for which there was no entitlement to any award of fees. Ibid. Second, the trial judge erred in awarding counsel fees for a prior *454 appeal. Ibid. Third, the hours billed were excessive on their face. Id. at 614-15, 591 A.2d 943. Fourth, the judge failed to consider "the amount genuinely in dispute." Id. at 616, 591 A.2d 943. Fifth, and finally, the judge considered the award of a twenty-five percent enhancement of the lodestar. Id. at 613, 616, 591 A.2d 943. The contingency of success was only one of several reasons why the trial judge made an upward adjustment; the other reasons, the quality and quantity of legal services provided, were clearly improper. Id. at 616, 591 A.2d 943. We did say in Chattin:
Moreover, the uncertainty as to the ultimate result was not a basis for any adjustment in the fee. See Pennsylvania v. Delaware Valley Citizens' Council [Delaware Valley II], supra, 483 U.S. at 727, 107 S.Ct. at 3087, 97 L.Ed.2d at 599 ("multipliers or other enhancement of a reasonable lodestar fee to compensate for assuming the risk of loss is impermissible under the usual fee-shifting statutes.").
[Ibid.]
However, in Chattin, supra, citing Delaware Valley I, supra, this court recognized that the lodestar amount may be increased in "rare" and "exceptional" cases. 243 N.J. Super. at 616, 591 A.2d 943.
Judge Meehan determined that the present case was "exceptional," justifying the fee enhancement. We observe also that none of the other reasons for disapproving the fee award in Chattin, supra, are present here. Nor was the fee enhancement here based improperly on the "quality or quantity" of legal services, as in Chattin, supra. Moreover, Judge Meehan had an ample record before him tending to justify fee enhancement. Chattin presented no such record.
In Chattin, supra, we did cite the opinion of the Court in Delaware Valley II, supra, and seemingly did leave a safety valve for considering fee enhancement. We now find without conflict with the Chattin opinion, that the fee enhancement here was proper. The Court in Delaware Valley II, supra, determined that the fee enhancement there was incorrect in part because it was for work done after the entry of a consent decree, whereas "[t]he risk of nonpayment should be determined at the beginning of the *455 litigation." 483 U.S. at 729, 107 S.Ct. at 3089, 97 L.Ed.2d at 600 (citation omitted). Here, unlike the district judge in Delaware Valley II, supra, the judge only applied the multiplier to the prejudgment fees. He specifically declined to apply it to the post-judgment fees because "there were no longer any risks involved."
The Court in Delaware Valley II, supra, also espoused a requirement for a finding, based on evidence in the record, "that without risk enhancement plaintiff would have faced substantial difficulties in finding counsel in the local or other relevant market." 483 U.S. at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601 (footnote omitted). This is exactly what the judge found here, based on a sound record of uncontradicted evidence. Thus, a fee enhancement would have been justified even under Delaware Valley II, supra, although the Court there did determine that a doubling of the lodestar was excessive, and that any fee enhancement should not exceed one-third of the lodestar. 483 U.S. at 730, 107 S.Ct. at 3089, 97 L.Ed.2d at 601.
More recently, indeed on the day before the judge in the present case rendered his initial determination on attorneys' fees, and two months before his written opinion on reconsideration, the United States Supreme Court decided City of Burlington v. Dague, 505 U.S. ___, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992). Between Delaware Valley II, supra, and Dague, supra, Justices Brennan and Marshall were succeeded by Justices Souter and Thomas. In a six to three decision, the Court absolutely abolished any enhancement of lodestar attorneys' fees for contingency under fee-shifting statutes. 505 U.S. at ___, 112 S.Ct. at 2643-44, 120 L.Ed.2d at 459. The Court was concerned that contingency enhancement would encourage attorneys "to bring relatively meritless claims." 505 U.S. at ___, 112 S.Ct. at 2641, 120 L.Ed.2d at 457. Rejecting Justice O'Connor's concurrence in Delaware Valley II, supra, Justice Scalia, writing for the majority in Dague, supra, explained that Justice O'Connor's two propositions, proof of the difficulty of finding counsel, and disallowing enhancement based on the riskiness of a particular case, "as a practical matter, *456 collide." 505 U.S. at ___, 112 S.Ct. at 2642, 120 L.Ed.2d at 457. As to Justice O'Connor's theory that enhancement should be based on the market treatment of contingent cases as a class, the Court said that there is no market treatment for non-monetary damages. Further, the majority determined that fee enhancement "would in effect pay for the attorney's time (or anticipated time) in cases where his client does not prevail." Id. at ___, 112 S.Ct. at 2643, 120 L.Ed.2d at 458. This, the Court said, would violate the statutory requirement of awarding fees only to prevailing parties. Ibid.
Noting that lodestar model fee awards were often higher than contingent-fee model awards, the Court felt that grafting a contingency enhancer "onto the lodestar model would be to concoct a hybrid scheme that resorts to the contingent-fee model to increase a fee award but not to reduce it." Id. at ___, 112 S.Ct. at 2643, 120 L.Ed.2d at 459. Finally, the Court was concerned with the "administrability" of the contingency enhancement. Ibid. It would "make the setting of fees more complex and arbitrary, hence more unpredictable, and hence more litigable," resulting in "satellite litigation." Ibid.
The dissenters in Dague (Blackmun, Stevens, and O'Connor) determined that a "reasonable" fee must be "fully compensatory," "calculated on the basis of rates and practices prevailing in the relevant market." Id. at ___, 112 S.Ct. at 2644, 120 L.Ed.2d at 459-60 (citations omitted). They recognized that a reasonable appreciation of the economics of law practice contemplates that a contingent fee must always be higher than a fee established and paid regardless of outcome. Id. at ___, 112 S.Ct. at 2644, 120 L.Ed.2d at 460. The dissent denied that contingency enhancement constituted an award to non-prevailing parties, accusing the majority of objecting to the amount of the award, rather than to who was receiving it. Id. at ___, 112 S.Ct. at 2645-47, 120 L.Ed.2d at 462-63. As to the Court's concern about "burdensome satellite litigation," the dissent said that under Justice O'Connor's standard, "the matter of the amount by which fees should be *457 increased would quickly become settled." Id. at ___, 112 S.Ct. at 2647, 120 L.Ed.2d at 463.
As to the majority's complaint that there is no market treatment for cases with non-monetary damages, the dissent pointed out that the district court must nevertheless find "a relevant private market" from which to select a lodestar fee. Id. at ___, 112 S.Ct. at 2647-48, 120 L.Ed.2d at 464. There is no reason "why this market disappears only when the inquiry turns to enhancement." Ibid. The dissent also faulted the majority for assuming that attorneys respond only to the possibility of losing particular cases. Ibid. Rather, attorneys prefer to avoid any contingency case, even the most meritorious, in favor of any case, regardless of merit, which guarantees payment. Ibid. Thus, according to the dissent, "[t]he strategy of the fee-shifting provisions is to attract competent counsel to selected federal cases by insuring that if they prevail, counsel will receive fees commensurable with what they could obtain in other litigation." Id. at ___, 112 S.Ct. at 2644, 120 L.Ed.2d at 460. The dissent in Dague concluded that the Court's decision "will seriously weaken the enforcement of those statutes for which Congress has authorized fee awards  notably, many of our Nation's civil rights laws and environmental laws." Ibid.
Judge Meehan, upon reconsidering his original ruling, concluded:
New Jersey's Supreme Court has been among the leaders in furthering the rights of employees. [S]ee Shebar v. Sanyo Business Systems Corp., 111 N.J. 276 [544 A.2d 377] (1988); Woolley v. Hoffman-La Roche, Inc., 99 N.J. 284 [491 A.2d 1257] (1985); Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58 [417 A.2d 505] (1980). Therefore, it seems quite probable that when confronted with the enhancement issue, our Supreme Court will adopt the analysis of the dissent in Dague. This Court chooses to apply the dissent in Dague in order to achieve a fair and just result in this matter.
The judge recognized that "New Jersey courts look to cases interpreting the federal civil rights law in construing the LAD," but correctly noted that "our courts are not bound by federal law."
The judge further found support for the contingency enhancement in R. 4:42-9. Section (a)(8) of that rule allows fees for legal *458 services "[i]n all cases where counsel fees are permitted by statute." Section (b) requires applications for counsel fees to be "supported by an affidavit of services addressing the factors enumerated by R.P.C. 1.5(a)." R.P.C. 1.5(a)(8) sets forth "whether the fee is fixed or contingent" as a factor for consideration in determining reasonableness.
We agree with the trial judge here. In view of the unrefuted attorneys' affidavits submitted, together with the difficulties plaintiffs had in obtaining counsel in this very case, a fee enhancement based on contingency considerations appears essential to the enforcement of the LAD. N.J.S.A. 10:5-3 sets forth a legislative finding and declaration that discrimination, including discrimination on the basis of sex, "threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free Democratic State," and "[t]he Legislature intends ... that this act shall be liberally construed." The New Jersey Supreme Court has recently reiterated its strong commitment "to end gender discrimination." In re Seaman, 133 N.J. 67, 98, 627 A.2d 106 (1993); Lehmann v. Toys `R' Us, Inc., supra, 132 N.J. at 600, 626 A.2d 445. We conclude that a liberal construction of N.J.S.A. 10:5-27.1, to promote the goal of ending discrimination, includes contingency fee enhancement in appropriate cases. In Balsley by Balsley v. North Hunterdon, 117 N.J. 434, 449, 568 A.2d 895 (1990), the Supreme Court clearly implied that its analysis in State v. Singer, 95 N.J. 487, 494, 472 A.2d 138, cert. denied, 469 U.S. 832, 105 S.Ct. 121, 83 L.Ed.2d 64 (1984), applied to the LAD's provisions on attorneys' fees as well as to federal civil rights cases. In Singer, 95 N.J. at 499, 472 A.2d 138, the Court said that the lodestar "may then be adjusted upward or downward to reflect any of those factors articulated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir.1974) [which parallel the requirements of R.P.C. 1.5(a)] and any other considerations that are deemed relevant by the court in the exercise of its sound discretion." Thus, our Court has implicitly, at least, adopted the multiplier approach to determine *459 reasonable attorneys' fees under N.J.S.A. 10:5-27.1. This is consistent with the Court's view that "the LAD's special procedural provisions are designed to encourage the initiation of grievances based on [unlawful] discrimination." Shaner v. Horizon Bancorp, 116 N.J. 433, 437, 561 A.2d 1130 (1989). Attorneys' fees are one remedy recognized in Shaner as "a special form of relief designed to encourage those who seek to vindicate the individual as well as societal interests of overcoming discrimination in the exercise of civil rights." Id. at 439, 561 A.2d 1130. The Dague 6-3 majority rule of no multiplier is at odds with this purpose and conflicts with the record before us on the impact of refusal to recognize contingency of success as a fee factor where an honestly calculated lodestar is based on fair hourly compensation.
Plaintiffs point out that one of the major concerns of the Court in Dague, supra, was that a contingency risk enhancement would encourage bringing non-meritorious claims as well as meritorious ones. 505 U.S. at ___, 112 S.Ct. at 2642, 120 L.Ed.2d at 457. As plaintiffs persuasively observe, "it is almost impossible to give a thorough risk analysis assessment at the beginning of a case, before discovery has even commenced." Depositions and other discovery are often crucial to proving the case. The plaintiffs contend that the Court in Dague, supra, "considers it almost a social evil that civil rights attorneys be allowed to subsidize those cases that do not succeed through awards of contingency multipliers for those cases that do prevail." In contrast, defense attorneys in civil rights actions "are paid whether they win or lose." As the dissent in Delaware Valley II, supra, expressed, enhancement for risk "is designed simply to place contingent employment as a whole on roughly the same economic footing as noncontingent practice, in order that such cases receive the equal representation intended by Congress." 483 U.S. at 745-46, 107 S.Ct. at 3097, 97 L.Ed.2d at 611. Even with a contingent fee enhancement, an attorney obtains a fee only when the client prevails. 483 U.S. at 752, 107 S.Ct. at 3101, 97 L.Ed.2d at 615. "As in the private market, what a successful attorney does with earned fees is the *460 attorney's own business." 483 U.S. at 753, 107 S.Ct. at 3101, 97 L.Ed.2d at 615.
Justice Scalia in Dague, 505 U.S. at ___, 112 S.Ct. at 2641, 120 L.Ed.2d at 456, expressed that "an enhancement for contingency would likely duplicate in substantial part factors already subsumed in the lodestar." He cynically said that "lodestar enhancement amounts to double counting." We very much doubt the accuracy of this theory when the lodestar is an honest sum based on the prevailing hourly rates charged by efficient attorneys for noncontingent matters, as the lodestar before us obviously is. Of course, if the lodestar is designedly "padded" to reflect contingency risks, this represents self-enhancement and that is another problem.
In our view, the reasoning of the dissent in Dague, supra, is more in accord with the express purpose of the New Jersey LAD than the view of the majority. Judge Meehan was correct in applying it "in order to achieve a fair and just result in this matter." We also conclude that the trial judge was correct in this particular case in concluding that the risk of nonpayment was not partially or substantially mitigated by the contingent fee portion of the agreement between plaintiffs and their attorneys so as to eliminate the need for a multiplier, a position taken by the dissent in Delaware Valley II, 483 U.S. at 749, 107 S.Ct. at 3099, 97 L.Ed.2d at 613. In the present case, the doubled lodestar equals $228,668.50. We have calculated that the partially contingent fee agreement executed by plaintiffs in this case provided for compensation of about $278,207 for the services rendered by counsel before judgment. (This is 25% of the recovery of $935,000 plus an hourly-rate calculation based on 50% of the median rate, or $68.75 per hour for partners and associates, times 646.65 hours.) A relatively standard one-third contingent fee would have yielded about $300,000 after expenses.
In Blanchard v. Bergeron, 489 U.S. 87, 95-96, 109 S.Ct. 939, 945, 103 L.Ed.2d 67, 76-77 (1989), the Court did not allow the sum due under a contingency agreement to constitute a limit or cap on the amount a court may award under 42 U.S.C.A. § 1988 when the *461 amount of damages is low. See Specialized Med. Sys. v. Lemmerling, 252 N.J. Super. 180, 599 A.2d 578 (App.Div. 1991) (contingent fee agreement did not cap counsel fee award provided by contract in a commercial case). In Venegas v. Mitchell, 495 U.S. 82, 90, 110 S.Ct. 1679, 1684, 109 L.Ed.2d 74, 84 (1990), also a 42 U.S.C.A. § 1988 claim, the Court determined that the prevailing plaintiff could be required to pay his attorney the difference between the amount due under their contingency agreement and the amount the judge awarded under the statute. The Court reasoned that the statutory award of fees does not abrogate the attorney-client agreement; it "controls what the losing defendant must pay, not what the prevailing plaintiff must pay his lawyer." 495 U.S. at 90, 110 S.Ct. at 1683, 109 L.Ed.2d at 84. Therefore, statutory awards of fees can coexist with private fee agreements. The scheme of § 1988 controls what the losing defendant must pay the plaintiffs' attorney, not necessarily what the prevailing plaintiff must pay her attorney. Of course, fidelity to the client required the successful plaintiffs' attorney here first to attempt to collect her fee from the defendant in this case.
In the case before us, plaintiffs proved that a multiplier was necessary to obtain competent representation, even when the attorneys, whose affidavits plaintiffs submitted, were also free to negotiate contingency agreements with prospective clients. Further, even with the multiplier of 2.0 which the judge awarded, the fee under the agreement, half the hourly rate of plaintiffs' attorneys plus twenty-five percent of the recovery, was still a larger sum by about $50,000 than the fee actually awarded by the judge. Thus, the use of the multiplier here clearly served the statutory purpose of enabling plaintiffs to obtain counsel, where plaintiffs may still be called upon to bear part of the bargained-for reasonable expense of representation.
The trial judge did not abuse his discretion in enhancing the fee in view of the evidence plaintiffs presented. Four attorneys, including an expert on attorneys' fees, certified that they and other attorneys either refused plaintiffs' employment cases on a *462 contingent basis altogether, or were extremely reluctant to take them. The market treats hourly fee cases far better than contingency cases. There is little meaningful compensation for contingency, so that counsel can not likely be obtained without a multiplier. Delaware Valley II, supra, 483 U.S. at 731-33, 107 S.Ct. at 3089-91, 97 L.Ed.2d at 601-03 (O'Connor, J., concurring). Plaintiffs here proved that they had substantial difficulty finding counsel and that adjustment for risk was necessary indeed to attract competent counsel.
The use of the multiplier also was justified in this particular case by the record when considered in light of the total fee and in relationship to the result. The statutory objective is to compel defendants who lose at trial to pay "reasonable attorneys fees" as damages. N.J.S.A. 10:5-27.1. We conclude that the lodestar multiplied by two or $228,668.50 is "reasonable" in this case. The fact that the defendant and not the plaintiffs must pay, has been determined by the Legislature as a matter of public policy. That is not our concern. Our only concern is the amount of a reasonable fee, a conclusion that ultimately is discretion-bound and fact-sensitive and not particularly suitable of reduction to a few black-letter rules. In setting an appropriate counsel fee in a fee-shifting context, Justice Handler has said: "[T]he court must, ... exercise a fine discretion dominated by equitable considerations, understanding that `[t]here is no precise rule or formula for making these determinations.'" Singer v. State, supra, 95 N.J. at 501, 472 A.2d 138. In fact, many of the arguments advanced against use of fee multipliers and enhancement seem to us veiled attacks on the policy of any fee-shifting at all in discrimination cases. That policy judgment is not before us. The Legislature has decided that nonprevailing defendants must pay "reasonable" fees to prevailing plaintiffs. We must follow its mandate.

VIII
In their cross-appeal plaintiffs claim that the judge erred in declining to apply a multiplier for counsel's post-judgment *463 work. The judge reasoned that "plaintiffs already had their judgment and there were no longer any risks involved." Plaintiffs argue that the judge erred in looking at the risks involved in this particular case, rather than contingent fee cases as a class, pursuant to Delaware Valley II, supra (O'Connor, J., concurring), 483 U.S. at 731, 107 S.Ct. at 3089, 97 L.Ed.2d at 601. Plaintiffs also urge that there are risks in post-trial work. Delaware Valley II, supra, involved only work for time spent enforcing a consent decree; the substantially reduced risk of loss at that time, as opposed to the beginning of the litigation, was a major reason why the Court held that the fee multiplier was improper. 483 U.S. at 730, 107 S.Ct. at 3089, 97 L.Ed.2d at 600. Similarly, here, although plaintiffs conceivably might have lost post-trial motions, that risk of loss was much smaller than at the outset of the case. We find no abuse of discretion in denial of the fee-multiplier at the post-verdict stage.
Plaintiffs also contend that the judge erred in dismissing Rendine's breach of contract claim and Lorestani's wage discrimination claim. However, they request that these issues be addressed only in the event of a reversal or remand. We need not consider these points.
Affirmed on the appeal and the cross-appeal.
A.A. RODRIGUEZ, J.S.C. (temporarily assigned), dissenting in part.
I join the majority in all aspects of its decision except that portion which holds that punitive damages were justified [section VI].
Even where the LAD has been violated, punitive damages should only be awarded in exceptional cases. Catalane v. Gilian Instrument, 271 N.J. Super. 476, 500-01, 638 A.2d 1341 (App.Div. 1994). The LAD does not substantially alter the common law requirements for this type of award. Id. at 500, 638 A.2d 1341. Thus, "in order for punitive damages to be awarded [under the LAD], the defendant's conduct must have been wantonly reckless *464 or malicious." Id. at 501, 638 A.2d 1341 (quoting Weiss v. Parker Hannifan Corp., 747 F. Supp. 1118, 1135 (D.N.J. 1990)). Furthermore, while the question of what conduct is wantonly reckless or malicious is one for the trier of fact, there must first be a legal foundation in the record to support a punitive damages award. Catalane, supra, 271 N.J. Super. at 501, 638 A.2d 1341. Moreover, it is fundamental that the legal basis of a punitive damages award lies not in the particular tort committed but in defendant's motives and conduct when committing it. W. Page Keeton, Prosser and Keeton, et al. on The Law of Torts § 2, at p. 9-10 (5th Ed. 1984).
The conduct of defendant Pantzer was both reprehensible and actionable under the LAD. The jury so found and awarded adequate compensatory damages to plaintiffs. However, there was no evidence of malicious conduct, i.e., that defendant's motives were to harm Rendine and Lorestani for harm's sake. The plaintiffs' proofs indicated that Pantzer's motivation was self-interest, i.e., to save his business from what he perceived to be the cost and inconvenience of employing women of child-bearing age. Neither was there evidence of wantonly reckless conduct. The foreseeable damage to plaintiffs was the loss of employment. That injury with its financial and emotional consequences was fully redressed by the jury's compensatory damage award. Absent evidence of evil motive or defendant's reckless disregard for the consequences of his actions to others, the judge should have directed a verdict on plaintiffs' claim for punitive damages. Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969).
NOTES
[1] At the time N.J.S.A. 10:5-4 stated:

All persons shall have the opportunity to obtain employment, and to obtain all the accommodations, advantages, facilities, and privileges of any place of public accommodation, publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation or sex, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.
"Familial status" was added by L. 1992, c. 146 § 2, and was defined to include "being the natural parent of a child." N.J.S.A. 10:5-5(ll).
[2] The Family Leave Act, N.J.S.A. 34:11B-1 to -16, was not effective until 1990. L. 1989, c. 261, § 18.
[3] The Civil Rights Act of 1991, 42 U.S.C.A. § 2000e-2(m) provides that "an unlawful employment practice is established when the complaining party demonstrates that ... sex ... was a motivating factor for any employment practice, even though other factors also motivated the practice." However, when the employer demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor," the court may not award damages or order reinstatement, hiring or promotion. 42 U.S.C.A. § 2000e-5(g)(2)(B).
[4] N.J.S.A. 10:5-27.1 states:

In any action or proceeding brought under this act, the prevailing party may be awarded a reasonable attorney's fee as part of the cost, provided however, that no attorney's fee shall be awarded to the respondent unless there is a determination that the charge was brought in bad faith.
[5] Pennsylvania v. Delaware Valley Citizens' Council for Clean Air (Delaware Valley I), 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986), was the opinion before re-argument.